Tiera CANADA, By and Through Robin
LANDY, her Guardian Ad Litem,
Respondents,

v.

Robert R. McCARTHY, Appellant.

No. C5–96–266.

Supreme Court of Minnesota.

Aug. 7, 1997.

---

William J. Maddix, Minneapolis, for respondent.

James T. Martin, Dan T. Ryerson, Gislason, Martin & Varpness, P.A., Edina, for appellants.

## OPINION

BLATZ, Justice.

This suit was filed on behalf of a minor, Tiera Canada, to recover damages caused by lead poisoning. Robert McCarthy, one of the defendants, was the owner of Tiera's grandmother's South Minneapolis apartment which was found to have hazardous levels of lead paint. A Hennepin County jury held McCarthy responsible for a portion of the more

than $1.4 million in damages. McCarthy filed post-trial motions for a new trial or for judgment notwithstanding the verdict (JNOV). The trial court denied McCarthy's motions, and he appealed to the court of appeals, which affirmed. McCarthy asks this court to reverse the lower courts with instructions that a judgment of dismissal be entered in his favor.

McCarthy argues that the trial court erred in not granting a JNOV for the following reasons: 1) Tiera did not prove that McCarthy owed a duty of reasonable care to Tiera; 2) Tiera did not prove that McCarthy breached a duty of reasonable care to Tiera; 3) Tiera did not offer any proof of causation; 4) McCarthy was relieved of any liability because the negligence of Tiera's mother and grandmother were superseding causes of Tiera's injuries; and 5) Tiera did not sustain her burden of proving damages. We affirm.

Tiera Canada was 2 years old when, in July 1992, doctors diagnosed her with lead poisoning. Tests conducted at Minneapolis Children's Medical Center (Children's) on July 23, 1992, showed her blood lead level to be 56 ug/dl.[1] On the basis of the test results, Children's notified the Minneapolis Health Department (health department). On July 31, 1992, Children's admitted Tiera for a five-day course of chelation therapy involving the infusion of calcium ethylenediaminetetraacetic acid through an intravenous line in her head.

At Children's, abdominal x-rays revealed opaque materials in Tiera's stomach and intestine which her doctors believed to be lead paint chips. Doctors also looked at Tiera's bones and found that she had abnormally thick and dense metaphyseal bands which are consistent with heavy metal poisoning. Treating physician Dr. Shashikant W. Sane, a pediatric radiologist, testified that the paint chips in the large intestinal tract were less than two weeks old. He also opined that based on the width of the metaphyseal bands

and the presence of paint chips in Tiera's body, Tiera had been poisoned within the previous six to eights weeks.

At the time of this first lead testing and treatment, Tiera lived with her mother, Christine Canada, in an apartment at 3514 14th Avenue South in Minneapolis, Minnesota (14th Avenue apartment). The 14th Avenue apartment was owned by Mark Klinkner and later sold to Brent Investment, Inc., a company owned by Brent Weiss. Christine Canada told doctors at Children's that she had seen Tiera eating paint chips at the 14th Avenue apartment about a year prior to her hospitalization.

At trial, Tiera's grandmother, Gertrude Canada, testified about Tiera's symptoms prior to her diagnosis. Gertrude Canada noticed that Tiera was acting differently than other children. Tiera cried a lot and was more hyperactive. Tiera also suffered from nosebleeds and would scratch herself so much she bled.

On July 31, 1992, the same day that Children's admitted Tiera for chelation therapy, Rebecca Caulfield, a sanitarian with the health department, visited Christine Canada's 14th Avenue apartment and collected samples of paint chips and dust for lead testing. Based on her conversation with Christine Canada, Caulfield also inspected Gertrude Canada's home, one unit of a fourplex apartment building owned by McCarthy at 3520 15th Avenue South (McCarthy property). At the McCarthy property, Caulfield collected dust swabs and a paint chip sample from the living room window jamb.

The results from the samples showed acceptable levels of lead at the 14th Avenue apartment. In contrast, the test of the paint sample taken from the McCarthy property showed a lead level of 18.7 percent, about 36 times the permissible level of .5 percent. The dust swabs, however, did not show excessive amounts of lead.

---

1. Blood lead levels are measured in micrograms per deciliter. At levels of about 10, doctors become more aggressive in monitoring. At all levels above 15, the health department is notified. Rebecca Caulfield, a sanitarian for the Minneapolis Health Department, testified that a child's environment is evaluated for lead hazards when a lead level of 20 or above is reported. At or above a level of 35, the risk of harm is so great that doctors test the patient to see whether medical intervention such as chelation therapy can lower the blood lead level. If a level above 55 is detected, doctors may go directly to chelation therapy without a screening test.

In a letter dated August 4, 1992, Caulfield issued an order to McCarthy requiring him to remove the windows in the apartment, to replace the sashes and window part stops, to install jamb liners, and to cover blind stops, window wells, and any exposed paint within the pocket of the window. The letter informed McCarthy that "CHILDREN AND PREGNANT WOMEN MUST *NOT* BE IN THE DWELLING DURING PAINT RE-MOVAL." (Emphasis in original). The letter also notified McCarthy that the Minneapolis Community Development Agency might be able to provide shelter for tenants during work. A contractor checklist accompanied the letter and order. The contractor checklist asked McCarthy to designate which abatement methods would be used in complying with the order.

McCarthy completed the contractor checklist on August 15, 1992. On it, he certified by his signature that his projected start date for the abatement work was August 17, 1992, and that he expected to finish by September 7, 1992. McCarthy indicated he would scrape and repaint the original window wells, jambs, crosspiece, exterior side of the upper sashes, and the lower sashes. He also indicated he would control dust by covering the furniture and carpeting. Finally, he indicated he would use a high efficiency particle accumulator (HEPA) vacuum to clean up, followed by a wet wash.

Soon after, on August 26, 1992, Caulfield inspected Christine Canada's 14th Avenue apartment a second time with an x-ray fluorescence lead detector, and discovered an excess of lead on the window trim in the bathroom. Caulfield then ordered the owner, Weiss, to remove the paint. Weiss never complied with this order and the property subsequently was condemned.

On August 28, 1992, Caulfield notified Children's by letter that she had told Christine Canada that the McCarthy property was "probably the primary source" of the lead Tiera ingested.

By September 21, 1992, Tiera's blood lead level had dropped to 25 ug/dl. At this time, Tiera continued to live at the 14th Avenue apartment with her mother. However, Tiera began to spend a lot of time at Gertrude Canada's home because her mother started working the morning shift at a 40–hour–per–week job. Christine Canada's job lasted a couple of months.

Meanwhile, sometime in mid-September, McCarthy began abatement work at the McCarthy property. He testified that he did not start until then because he had to wait for the replacement windows. McCarthy, who described the abatement as a "wrecking sort of operation," removed all the window sashes from all the windows, placed them in plastic bags and put them away.

McCarthy testified that when he was performing the abatement, he covered the furniture and also covered the floor with a plastic drop cloth which caught all of the dislodged paint chips. He also closed the doors, when there was one, to seal off the work area. He did not, however, see any need to seal off the area between the dining room and the living room. He also did not use a HEPA vacuum to clean up; rather, he used a Shop Vac. McCarthy testified that he tried to rent a HEPA, but was unsuccessful. The one rental company he contacted did not have one available. McCarthy also talked to a contractor about purchasing a HEPA, but learned that such a vacuum would cost about $3,500. After not being able to secure a HEPA, McCarthy said he believed he told Caulfield he was going to use a regular vacuum. Caulfield, however, could not recall giving McCarthy permission not to use a HEPA vacuum, and said she would never allow someone to use a regular vacuum to pick up lead debris. Caulfield testified that it was important to use a HEPA vacuum for clean-up because it traps the lead so that it does not become airborne as it would with a typical vacuum cleaner.

McCarthy was aware that Gertrude Canada had young children living with her. He testified that he saw Tiera "once or twice" while he was doing abatement. He testified that he told Gertrude Canada that Tiera was not supposed to be there and that Tiera was never in a room where he was actually doing work.

Much of Gertrude Canada's testimony concerning abatement conflicted with that given

by McCarthy. She testified that her family members would come and go freely while McCarthy was doing abatement work and that McCarthy never offered to relocate her family during abatement. Further, Gertrude Canada testified that McCarthy did not seal off the rooms as he worked, except that he "might have" shut the door to her bedroom, which is the only door he possibly could have closed. In contrast to McCarthy's testimony, she said he did not cover any of the furniture, including the bed in which Tiera occasionally slept. Gertrude Canada also said the floor coverings did not cover the entire floor surface and that at the end of each day's work, McCarthy would vacuum the floor with a Dirt Devil vacuum.

Gertrude Canada conceded that she had been told by someone at the health department that it was not safe for pregnant women and children to be present during abatement. She testified that she and Christine Canada tried to keep Tiera outside the house while McCarthy was working. She also said that Tiera often spent the night at her apartment, and when she did, she slept in Gertrude Canada's bedroom which had nine windows.

Christine Canada also admitted that she knew Tiera should not be at a place where abatement was going on. She had been so advised in a "Recognition of Lead Hazard" form she had signed on August 28, 1992. Christine Canada admitted that she knew that if Tiera were present during abatement, there was a risk Tiera would breathe in dust, "pick up" paint chips, or be exposed to lead in some other way.

In November 1992, Christine Canada and her family moved out of the 14th Avenue apartment and into a lead-free dwelling at 3554 17th Avenue South.

On November 23, 1992, McCarthy contacted the health department and notified Caulfield that washing, the cleanup of the lead

abatement, was to begin that day. In December 1992, Caulfield took dust swabs from the McCarthy property. The test results on the samples showed lead levels within acceptable state limits. On December 11, 1992, Caulfield closed her file on the McCarthy property. That same month, Christine Canada and her family moved into the McCarthy property where they stayed until mid-March 1993.

By January 15, 1993, Tiera's blood lead level had jumped to 48 ug/dl. Prior testing results indicated that it had been increasing steadily from a blood lead level of 25 ug/dl on September 21, 1992, about the same time McCarthy began abatement at the McCarthy property. In response to this second spike, Dr. Milagros Santiago, one of Tiera's treating pediatricians, decided to readmit Tiera for a second 5–day course of chelation therapy. At trial, Dr. Santiago testified that lead particles can be inhaled and that dust can accumulate on fingertips. Once ingested, the blood stream disperses the lead throughout the entire body.

Dr. Allan P. Ingenito, an expert for McCarthy, was asked to explain the cause of this second dramatic rise in Tiera's blood lead level. He first testified that the 48 ug/dl spike "could well be" a rebound from the first chelation therapy. He explained that once the lead is mobilized from the bones and tissue by chelation therapy, it falls into the blood and sometimes raises the lead level readings. Rebound typically occurs within two weeks after chelation therapy. In this case, the 48 ug/dl reading came about six months after Tiera's first chelation therapy. Dr. Ingenito later testified that, in his opinion, it was likely that Tiera had suffered a second lead poisoning.[2]

On February 9, 1993, the health department received a notice from Children's reporting that Tiera's blood lead level had been

---

2. The defense theory of the case was that the 48 ug/dl reading was nothing more than a rebound from the first chelation therapy. During redirect examination, defense counsel pressed his witness, Dr. Ingenito, for an opinion to a reasonable degree of medical certainty as to whether a rebound was occurring. In response, Dr. Ingenito said he did not have an opinion to a reasonable

degree of medical certainty. Defense counsel then asked him if he had an opinion as to the cause of the 48 reading, to which Dr. Ingenito responded "I think it is likely that she's had another exposure." Dr. Ingenito's response was consistent with Tiera's theory that she was poisoned twice.

elevated once more. In response to this notification, Caulfield reinspected the McCarthy property. At the time of the reinspection, Caulfield had not been told that McCarthy did not use a HEPA vacuum or that Tiera was present during abatement. At the McCarthy property, Caulfield took a water sample and three dust swab samples which showed lead levels to be within acceptable limits. However, testing conducted at the McCarthy property in July 1994 showed that impermissible levels of lead remained in the kitchen, bedroom, and bathroom.

In mid-March 1993, Christine Canada and Tiera moved from the McCarthy property to 3549 10th Avenue South. That property, owned by Loren Lund, also contained unacceptable levels of lead on the jamb of the southeast bedroom window.

In the fall of 1993, Tiera, through her mother, Christine Canada, filed suit against Weiss and the previous owner of the 14th Avenue apartment, Mark Klinkner. McCarthy was also named as a defendant. In the course of this litigation, the corporation, Brent Investment, Inc., was substituted for Weiss, and the Estate of Loren Lund was added as a defendant. Meanwhile, Klinkner asserted and later dismissed a third-party complaint against Gertrude Canada seeking indemnity and/or contribution from her for her alleged negligence. In October 1993, McCarthy asserted a counterclaim against Christine Canada and, at some point, asserted a claim against Gertrude Canada. By the time trial began on February 21, 1995, the Estate of Loren Lund, Klinkner, and Brent Investment, Inc. had settled. McCarthy had also dropped claims against Gertrude and Christine Canada on the basis that any judgment entered against them would be uncollectible. McCarthy, however, reserved the right to submit the issue of their causal fault to the jury. The claims against McCarthy were based on negligence and negligence per se.[3]

At trial, Elsa Shapiro, Ph.D, a neuropsychologist, testified about damages caused by Tiera's exposure to lead. She said that testing she conducted showed that Tiera was average in her non-verbal activities and that her visual memory was normal, but that her verbal memory abilities were a bit low. What was "very worrisome [was] that she has very poor motor skills." Tiera also had a poor attention span that was "way outside the normal range." In Dr. Shapiro's opinion, "lead overburden" caused a "substantial amount" of Tiera's problems.

Dr. Shapiro testified that when assessing the harm caused by lead poisoning, high blood lead levels are not as significant as their duration. She explained: "[I]f a child has an elevated lead level over a period of, you know, several years, [the child] is much more likely to be affected than a child who has a high lead level for just a short period of time." She also said that children between 18 and 30 months old are particularly vulnerable. This is the time a child's development is most likely to be compromised and the age range when children are more likely to put their hands in their mouths. Evidence at trial indicated Tiera was likely exposed to lead during this critical time period.

Dr. Ingenito, McCarthy's expert, disputed Dr. Shapiro's conclusion that lead was to blame for Tiera's problems. In his opinion, Tiera's diagnosis was "low, normal developmental milestones or mild developmental delay, expressive speech difficulties, fine motor skill difficulties, and mild behavioral difficulties." Dr. Ingenito testified that the causes were multi-factorial. He identified a genetic component (Tiera's aunt had similar developmental milestones), a psychosocial component based on Christine Canada's low parenting skills, and Tiera's malnutrition during the critical time of Tiera's brain development. Dr. Ingenito testified that, in his opinion, it was less likely that the lead caused any cognitive deficits. Additionally, he said it was "highly unlikely that the lead would produce symptoms of attention deficit disorder per se." In Dr. Ingenito's view, Tiera's cognitive injuries would be hard, if not impossible, "to definitely attribute to lead." He said

---

3. Tiera's complaint outlined the basis for the negligence per se count. Tiera alleged that the defendants "violated various state statutes, Minneapolis City Ordinances and regulations that were intended to protect young children from lead poisoning."

he would have expected the same developmental delay without the lead exposure.

On cross-examination, however, Dr. Ingenito admitted that studies have demonstrated that a child's intelligence is inversely related to blood lead levels.[4] Dr. Ingenito agreed that one study had shown that children with high blood lead levels had a "sixfold risk of having a reading disability," deficits in vocabulary, and problems with attention. In June 1993, a test showed Tiera's IQ to be 87, which is the low end of the normal range. In the summer of 1994, a second test showed her IQ to be 78. Dr. Ingenito also conceded that some studies have shown a relationship between lead poisoning and attention deficit disorder.

At the close of evidence, McCarthy sought a directed verdict on the negligence and negligence per se counts. One of his arguments for a directed verdict on the negligence count was that Gertrude Canada's and Christine Canada's negligent acts in allowing Tiera to be present during abatement were superseding causes of Tiera's injuries. The trial court granted McCarthy's motion only as to the negligence per se count.

Subsequently, at the request of both Tiera and McCarthy, the trial court instructed the jury on negligence. The jury was also instructed on the duty of a parent and grandparent to exercise reasonable care in the supervision of a child or grandchild. Additionally, the jury was instructed to apportion the damages between those occurring prior to July 26, 1992,[5] and those occurring after that date. The special verdict form asked jurors to further assign a percentage of fault among McCarthy, Klinkner, Brent Investment, Inc., Gertrude Canada, and Christine Canada for damages prior to July 26, 1992, and to assign a percentage of fault among McCarthy, Estate of Loren Lund, Brent Investment, Inc., Gertrude Canada, and Chris-

tine Canada for damages occurring after that date.

On March 1, 1995, the jury returned a verdict in favor of Tiera. The jury found that Tiera had sustained $710,250 in damages for pre-July 26, 1992 injuries for which McCarthy was not negligent. The jury, however, found McCarthy, Brent Investment, Inc., the Estate of Loren Lund, Gertrude Canada, and Christine Canada to be negligent after July 26, 1992, and that the negligence of each one individually was a direct cause of Tiera's lead poisoning. The jury then assessed McCarthy with 16% of the fault, Estate of Loren Lund, 7%, Brent Investment, Inc., 13%, Gertrude Canada, 28%, and Christine Canada, 36%. The jury awarded a total of $710,250 in damages for injuries occurring after July 26, 1992.

Finding joint and several liability for the damages caused by the lead poisoning after July 26, 1992, the trial court, pursuant to Minn.Stat. § 604.02, subd. 2 (1996), reallocated the uncollectible portion of the award attributable to Gertrude Canada and Christine Canada among McCarthy, Brent Investment, Inc., and the Estate of Loren Lund according to each of their respective levels of fault. After the allocation, McCarthy's share of liability increased to 16/36ths of the post-July 26, 1992 damages awarded.

After trial, both Tiera and McCarthy filed post-trial motions. On October 23, 1995, the trial court denied all of the motions except for one of McCarthy's motions relating to Tiera's past medical expenses. McCarthy's liability was thereby fixed at 16/36ths of $705,125 ($313,388.89).

The court of appeals affirmed, and this court granted McCarthy's petition for review.

I.

 In reviewing a trial court's denial of a JNOV, the applicable standard is whether

---

4. Previously, Dr. Shapiro had testified that studies looking at the connection between lead poisoning and IQ have generally shown that for every 10 ug/dl of lead burden that a child has, the child's IQ is lowered between four and eight points.

5. The trial court initially instructed the jury to apportion the damages between those occurring

before July 23, 1992, and those occurring after July 23. After deliberations began, the jury noted that the date on the special verdict form did not match the July 26, 1992 date on one of the exhibits. The court then instructed the jury to use the July 26, 1992 date. The actual testing date of Tiera was July 23, 1992.

any competent evidence exists that reasonably tends to sustain the verdict. *Seidl v. Trollhaugen, Inc.*, 305 Minn. 506, 507, 232 N.W.2d 236, 239 (1975). We consider the evidence in the light most favorable to the verdict and must affirm the trial court's order denying the motion for JNOV unless the evidence is practically conclusive against the verdict, or reasonable minds could reach but one conclusion which is against the verdict. *Id.* The testimony of a single witness may suffice as the basis for a verdict. *Id.*

 The first issue on appeal is whether McCarthy owed a duty of care to Tiera. The existence of a duty is generally a question of law for this court to decide de novo. *H.B. and S.B. By and Through Clark v. Whittemore*, 552 N.W.2d 705, 707 (Minn.1996).

In determining that McCarthy had a general duty of reasonable care, the trial court noted that McCarthy had been ordered by the health department to abate the lead hazard at the McCarthy property, he had been warned of the hazards of abatement, and he had been informed that children and pregnant women were not to be present during abatement. The trial court also noted that McCarthy was notified of the need to use a HEPA vacuum, and he had certified that he would use one. The trial court concluded that "[b]ased on the procedures he agreed to follow in abating the lead paint and the foreseeable risk of injury to Tiera Canada, McCarthy clearly owed a duty of reasonable care to Tiera Canada."

The court of appeals agreed that McCarthy owed Tiera a duty, but grounded its holding on a landlord's duty to make repairs in a reasonable manner. The court of appeals also went much further in precisely defining the duty, stating that McCarthy had a duty to refrain from doing abatement work while Tiera was present and that McCarthy had a duty to carry out abatement procedures "in the manner he certified he would" on the contractor checklist.

 We agree that McCarthy owed a duty of care to Tiera. Specifically, McCarthy, who was ordered to abate a lead hazard on his property, had a duty to perform the abatement in a reasonable manner. This

duty is predicated on the landlord/tenant relationship and extends to guests of the tenant. McCarthy owed Tiera, a guest in her grandmother's home, the same duty he owed Tiera's grandmother, his tenant. *See Johnson v. O'Brien*, 258 Minn. 502, 505 n. 1, 105 N.W.2d 244, 246 n. 1 (1960); *Ames v. Brandvold*, 119 Minn. 521, 524–25, 138 N.W. 786, 787 (1912) (permitting guest claim against landlord when complaint alleged that rotting floor of outhouse gave way, because landlord allegedly knew of latent condition at time of lease).

In *Wood v. Prudential Ins. Co. of America*, 212 Minn. 551, 4 N.W.2d 617 (1942), we held that a landlord owed a duty of reasonable care in making repairs. Specifically, we said that once a landlord assumes the obligation of correcting a defect, the landlord "must bear the burden of failure to make a good job of it." *Id.* at 556, 4 N.W.2d at 620. To impose a duty of reasonable care in this instance is particularly compelling. Here, the health department ordered McCarthy to abate a lead hazard on his property. Once so ordered, McCarthy had a duty to perform the necessary repairs in a reasonable way that would not cause harm to a tenant or guest.

 McCarthy's counsel conceded at oral argument that landlords have a duty to carry out repairs in a reasonable manner. However, McCarthy takes issue with the court of appeals' conclusion that McCarthy specifically had a duty to do the abatement as he so certified on the contractor checklist. We, too, are troubled by this reasoning. The court of appeals cited no case for this proposition and, even presuming the contractor checklist, which was signed only by McCarthy, is likened to a contract, we have said that "the standard of care owed to others by a contracting party is not fixed by the terms of the contract." *Mervin v. Magney Const. Co.*, 416 N.W.2d 121, 125 (Minn.1987). In other words, while the terms in an agreement could be considered by the jury in deciding reasonableness, they would not, by themselves, establish a standard of care. Therefore, we specifically reject the court of appeals' apparent use of a contractor check-

list as conclusively establishing the extent of the duty owed by a landlord.

■ McCarthy further argues that even if he did owe a duty to Tiera, he was relieved of liability because Tiera was under the care of Christine and Gertrude Canada who were aware of the lead abatement hazards. McCarthy asserts that *Sirek by Beaumaster v. State, Dept. of Natural Resources*, 496 N.W.2d 807 (Minn.1993), dictates this outcome. In *Sirek*, this court addressed the issue of whether the Department of Natural Resources (the state) could be held liable for injuries suffered by a 6–year–old girl who was in a state park crossing a highway with her parents when she was struck by a van. *Id.* at 808–09. The Minnesota Tort Claims Act immunizes the state from liability except " 'for conduct that would entitle a trespasser to damages against a private person.' " *Id.* at 809 (quoting Minn.Stat. § 3.736, subd. 3(h) (1992)). Accordingly, this court considered what duty the state owed to a trespassing child, specifically addressing whether section 335 or section 339 of the Restatement (Second) of Torts (1965) [6] applied. *Id.* at 809–11. Section 335, the general provision on the duty owed to trespassers, establishes a limited standard of care. *Id.* at 810. In contrast, section 339 imposes a heightened standard of care with respect to child trespassers. *Id.*

In reaching our decision that section 335 applied to the underlying conduct in the *Si-*

*rek* case, this court noted that landowners may be relieved of a duty to warn or to remove dangerous instrumentalities from which the danger is apparent, when small children are being watched by parents or someone entrusted with supervision. *Id.* at 811 (citation omitted). It is this language that McCarthy argues relieves him of liability in the instant case.

McCarthy's reliance on *Sirek* is misplaced. Tiera was not a trespasser. Further, the *Sirek* case and its progeny have all been within the context of statutory immunity. Therefore, we conclude that *Sirek* is inapplicable. "The rule of law in trespass cases contrasts sharply from the duty of reasonable care owed by most landowners." *Id.* at 809. In the instant case, McCarthy, Gertrude Canada, and Christine Canada each owed an independent duty of care to Tiera, and no duty was extinguished by the negligence of another.

## II.

■ The second issue raised by McCarthy is whether competent evidence existed to demonstrate that McCarthy was negligent. The question of negligence is ordinarily a question of fact and not susceptible to summary adjudication. *Illinois Farmers Ins. Co. v. Tapemark Co.*, 273 N.W.2d 630, 633–34 (Minn.1978). The jury in its special

---

6. Section 335 of the Restatement (Second) of Torts provides:

A possessor of land who knows, or from facts within his knowledge should know, that trespassers constantly intrude upon a limited area of the land, is subject to liability for bodily harm caused to them by an artificial condition on the land, if

(a) the condition

(i) is one which the possessor has created or maintains and

(ii) is, to his knowledge, likely to cause death or seriously [sic] bodily harm to such trespassers and

(iii) is of such a nature that he has reason to believe that such trespassers will not discover it, and

(b) the possessor has failed to exercise reasonable care to warn such trespassers of the condition and the risk involved.

Section 339 provides:

A possessor of land is subject to liability for physical harm to children trespassing thereon caused by an artificial condition upon the land if

(a) the place where the condition exists is one upon which the possessor knows or has reason to know that children are likely to trespass, and

(b) the condition is one of which the possessor knows or has reason to know and which he realizes or should realize will involve an unreasonable risk of death or serious bodily harm to such children, and

(c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling with it or in coming within the area made dangerous by it, and

(d) the utility to the possessor of maintaining the condition and the burden of eliminating the danger are slight as compared with the risk to children involved, and

(e) the possessor fails to exercise reasonable care to eliminate the danger or otherwise to protect the children.

verdict found that McCarthy was negligent after July 26, 1992.

The evidence presented at trial supports the jury's conclusion. We hold that, in light of the facts set forth previously in this opinion, there was competent evidence to support the jury's conclusion that McCarthy breached his duty of care to Tiera when he continued to do abatement work after he saw Tiera on the premises and when he failed to do the abatement in a reasonable way that minimized the level of lead sources to which Tiera could be exposed.

### III.

The third issue presented concerns proximate cause. Generally, whether the defendant's negligence proximately caused the plaintiff's injuries is a question of fact for the jury. *Lubbers v. Anderson*, 539 N.W.2d 398, 402 (Minn.1995). However, when reasonable minds could reach only one conclusion, the existence of proximate cause is a question of law. *Id.* "[F]or a party's negligence to be the proximate cause of an injury, the act [must be] one which the party ought, in the exercise of ordinary care, to have anticipated was likely to result in injury to others * * *." *Id.* at 401 (quoting *Wartnick v. Moss & Barnett*, 490 N.W.2d 108, 113 (Minn.1992)) (internal quotation marks omitted). There must also be a showing that the defendant's " 'conduct was a substantial factor in bringing about the injury.' " *Id.* at 401–02 (quoting *Flom v. Flom*, 291 N.W.2d 914, 917 (Minn.1980)).

The plaintiff is not required to prove causation by direct evidence only. *Hartwig v. Loyal Order of Moose, Brainerd Lodge No. 1246*, 253 Minn. 347, 366, 91 N.W.2d 794, 808 (1958). However, circumstantial evidence must be consistent to the extent that it furnishes a reasonable basis for supporting an inference by the jury of the ultimate fact that the defendant's negligence caused the plaintiff harm. *Id.*

McCarthy asserts that Tiera failed to offer any evidence that his negligence directly caused any harm after July 1992. Specifically, he claims that Tiera failed to offer proof she was actually exposed to lead at McCarthy's property and that the trial court, therefore, should have granted a JNOV.

McCarthy asks too much in his arguments, contending essentially that Tiera was required to offer direct proof that she actually ingested lead paint or dust. The direct and circumstantial evidence presented here supports the jury's verdict as to causation. Lead chips may be eaten and particles contained in dust may be inhaled. This is a particular danger with small children. *See Norwood v. Lazarus*, 634 S.W.2d 584, 587 (Mo.Ct.App.1982) ("It is well known that children of tender years have a proclivity to put anything they can get into their hands into their mouths."). Tiera was a lead-burdened child in the proximity of lead paint that had been disrupted during abatement work. There was evidence that McCarthy did not seal off the rooms, did not cover furniture, and did not use a HEPA vacuum to contain the lead dust. Concurrent with and subsequent to the abatement work, Tiera showed an increase in her blood lead levels. In fact, after September 21, 1992, while abatement was continuing, Tiera's lead level climbed, reaching a level of 48 ug/dl by January 15, 1993.

McCarthy also asserts that Tiera failed to prove McCarthy caused any harm. Specifically, he points to her failure to offer testimony "to any degree of medical certainty" that Tiera's 1993 lead levels were not the result of a rebound from the first exposure prior to July 1992, for which the jury found McCarthy not negligent. McCarthy's argument is defeated by his own expert's testimony. In response to a question on redirect examination, Dr. Ingenito opined that Tiera had been poisoned a second time.

Based on the foregoing, we hold that competent evidence existed upon which the jury could find that the McCarthy property was a source of lead poisoning and that McCarthy's negligence caused Tiera some harm.

### IV.

The fourth issue raised in this appeal is whether the negligence of Gertrude Canada and Christine Canada, Tiera's grandmother

and mother, were superseding causes of Tiera's injury.

 For an intervening cause to be considered a superseding cause, the intervening cause must satisfy four elements: 1) its harmful effects must have occurred after the original negligence; 2) it must not have been brought about by the original negligence; 3) it must have actively worked to bring about a result which would not otherwise have followed from the original negligence; and 4) it must not have been reasonably foreseeable by the original wrongdoer. *Wartnick,* 490 N.W.2d at 113. Unless all four elements are satisfied, an intervening cause cannot be considered superseding. *Id.*

 The trial court refused to give an instruction on superseding cause. The court of appeals agreed, concluding that the trial court properly refused to instruct the jury on superseding cause because Christine Canada's and Gertrude Canada's negligent supervision preceded McCarthy's negligence in allowing Tiera to be present during abatement. Moreover, the court of appeals noted that there was no superseding cause alleged for any injury Tiera suffered resulting from McCarthy's failure to use appropriate abatement procedures. We agree with the court of appeals.

### V.

 We now turn to the final issue, whether Tiera met her burden of proving damages. In an ordinary civil action, the plaintiff has the burden of proving damages caused by the defendant by a fair preponderance of the evidence. *See Carpenter v. Nelson,* 257 Minn. 424, 427, 101 N.W.2d 918, 921 (1960). The plaintiff must demonstrate with reasonable certainty the nature and probable duration of the injuries sustained. *Lowe v. Armour Packing Co.,* 148 Minn. 464, 467, 182 N.W. 610, 611 (1921).

In this case, the trial court instructed the jurors on the plaintiff's general burden of proving damages, advising the jury that "[a] party seeking damages must prove the nature, extent, duration, and consequences of her harm."

McCarthy contends that Tiera bore the additional burden of demonstrating by a preponderance of the evidence what damages she suffered prior to July 1992 and what damages she sustained as the result of McCarthy's negligence after July 1992. Because Tiera failed to meet this burden, McCarthy argues, he was entitled to a JNOV. McCarthy specifically contends 1) that Tiera had this burden because the trial court instructed the jury to separate damages for lead poisoning occurring before and after July 26, 1992; and 2) that Tiera had the burden of showing the extent of aggravation of her preexisting injury (prior lead poisoning). We disagree.

 The controversy over these two issues at the trial court was evident during discussions concerning jury instructions. Relying on the single indivisible injury rule, Tiera contended that neither an instruction on apportionment of damages between pre-July 1992 and post-July 1992, nor an instruction on aggravation of a preexisting injury, was appropriate because her injuries were indivisible. Under the single indivisible injury rule, joint and several liability is imposed when two or more persons acting independently cause harm to a third person through consecutive acts of negligence closely related in point of time and when the harm is incapable of division. *Mathews v. Mills,* 288 Minn. 16, 20–21, 178 N.W.2d 841, 844 (1970). "'[U]nless the damage caused by each is *clearly separable,* permitting the distinct assignment of responsibility to each, each is liable for the entire damage. The degree of culpability is immaterial.'" *Id.* at 21, 178 N.W.2d at 844 (citations omitted) (emphasis in original).

 The burden of proving that the harm is capable of being separated lies with each defendant who contends it can be divided. *Id.* at 22, 178 N.W.2d at 845 (quoting Restatement (Second) of Torts § 433B(2) (1965)). "This placement of the burden of proof is justified by considerations of fairness * * * the rule is a result of a choice made as to where a loss due to failure of proof shall fall—on an innocent plaintiff or on defendants who are clearly proved to have been at fault." *Id.* Whether the injury is capable of

apportionment is a question of law. *Id.* at 23, 178 N.W.2d at 845. Once the trial court finds that the harm can be apportioned, the question of actual apportionment is a question of fact for the jury. *Id.*

 Here, the trial court decided that because there was some evidence of a second injury, the defendant had met his burden of showing the injuries could be apportioned pre- and post-July 1992.[7] The trial court, therefore, instructed the jury to apportion the damages between those resulting from pre-July 1992 lead poisoning and damages occurring after that date. The trial court also instructed the jury that a person who had a defect or disability at the time of an accident is entitled to damages for aggravation of such previous existing conditions, but that damages are limited to those over and above those which would normally have followed from the pre-existing condition had there been no accident.

In its decision regarding the parties' post-trial motions, the trial court ruled that Tiera's burden was to show that the defendants caused some harm and that she bore no burden to prove damages occurring before July 1992 and those occurring after July 1992. The court of appeals agreed, holding that McCarthy had the burden to prove any apportionment of damages.

We agree with the lower courts. When the trial court determined the injuries were capable of division, the burden remained with McCarthy to prove any apportionment of damages. *Id.* at 23, 178 N.W.2d at 845. It was his burden to "absolve himself by proving his own innocence or limited liability." *See id.*

Finally, McCarthy's argument that Tiera had to prove the extent of aggravation of her preexisting injury that she suffered after July 26, 1992, is, likewise, unpersuasive. Given the facts of this case, the burden of

apportioning damages remained, at all times, with McCarthy.

In conclusion, we hold that McCarthy owed Tiera a duty of reasonable care when performing abatement work and that competent evidence existed to support the jury's verdict that McCarthy breached this duty and directly caused harm to Tiera. We further hold that the negligent supervision of Tiera was not a superseding cause of her injuries and that Tiera had no burden of apportioning damages.

Affirmed.

---

7. We note that the issue of whether this division was proper has not been appealed to this court. Nevertheless, a review of the record does not lend guidance to this court as to why the trial court determined Tiera's injuries were divisible. Tiera obtained her first lead level test in July 1992, but there is no evidence of prior testing or

of whether that particular test captured an all-time high level or if, in fact, it reflected a decrease in lead poisoning. Further, Tiera's place of residence did not change during July 1992. This fact also detracts from our understanding of why the July 26, 1992 date was chosen as a division point.