Gerald LIETZ, et al., Plaintiffs,

Jaenty, Inc., d/b/a Taco John's Restaurant, Appellant,

v.

NORTHERN STATES POWER COMPANY, Respondent,

Seren Innovations, Inc., Respondent,

Cable Constructors, Inc., Respondent,

Sirti, Ltd., Respondent.

No. A04–901.

Supreme Court of Minnesota.

July 27, 2006.

Steven L. Theesfeld, Yost, & Baill, LLP, Minneapolis, MN, for Appellant.

Timothy R. Thornton, Matthew D. Forsgren, James R. Asmus, Briggs & Morgan, P.A., Minneapolis, MN, for Respondent NSP.

Michael T. Feichtinger, Kenneth H. Bayliss, Quinlivan & Hughes, St. Cloud, MN, for Respondent Cable Constructor.

Cooper S. Ashley, Julian C. Zebot, David Herr, Maslon Edelman Borman & Brand, LLP, Minneapolis, MN, for Respondent Seren Innovations.

Stephen A. Melcher, Fabyanske, Westra, Hart & Thomson, P.A., Minneapolis, MN, for Respondent Sirti, Ltd.

## OPINION

ANDERSON, G. BARRY, Justice.

In late 2001 and early 2002, appellant Jaenty, Inc. (Jaenty) brought an action against respondents Northern States Power Co. (NSP), Seren Innovations, Inc. (Seren), Cable Constructors, Inc. (CCI) and Sirti, Ltd. (Sirti) to recover for damages sustained in a gas explosion in December of 1998. The district court granted respondents' motions for summary judgment based on the two-year statute of limitations found in Minn.Stat. § 541.051, subd. 1(a) (2004). The court of appeals, in a split decision, affirmed the district court. *Lietz v. N. States Power Co.*, No. A04–901, 2005 WL 44905, at *4 (Minn.App. Jan.11, 2005). We agree that Jaenty's suit is barred by section 541.051 and therefore affirm.

On December 11, 1998, while installing a utility pole support anchor (the anchor) in St. Cloud, Minnesota, employees of CCI pierced a gas line owned by NSP, causing a natural gas leak. The installation of the anchor was part of a project by Seren to construct a fiber-optic communication system in the area. Seren had hired Sirti to plan the project, and CCI was hired to do the actual installation. The anchor was a steel rod, five feet six inches in length, with a helix at the bottom that acted as a bit during installation. The anchor was intended to support the utility pole via a guy line. The anchor and guy line were intended to balance the weight of the fiber-optic cable and keep the pole upright. On the date of the explosion, CCI was installing anchors in St. Cloud in preparation for the installation of fiber-optic cable.

After breaking a hole in the sidewalk with a jackhammer, the CCI workers placed an auger, or "anchor cranker," on top of the anchor and began to auger the anchor into the ground. After the anchor had bored to a depth of approximately one and one-half to two feet, it hit a hard object, later determined to be a large slab of granite. In an attempt to break through the obstruction, the workers removed the auger and struck the top of the anchor with a sledgehammer. They then placed the auger on top of the anchor and resumed boring. Everything appeared normal until the top of the anchor was roughly 12 to 18 inches above the surface of the ground. At that time, the workers smelled gas and noticed dirt blowing from the anchor hole. Realizing they had pierced a gas line, the workers stopped the auger, and the crew foreman telephoned his supervisor.

Less than an hour after the anchor struck the gas line, an explosion occurred. Four people were killed in the explosion, a number of others suffered injuries, and the surrounding buildings sustained damage. In late 2001 and early 2002, Jaenty commenced this action against CCI, Seren, Sirti, and NSP for damages to its restaurant. The district court granted the defendants' motions for summary judgment, finding that, because Jaenty's injuries were caused by an improvement to real property (the anchor), Jaenty's claim was barred by the two-year statute of limitations in Minn.Stat. § 541.051, subd. 1(a). The relevant part of the statute provides:

[N]o action by any person in contract, tort, or otherwise to recover damages for any injury to property * * * arising

out of the defective and unsafe condition of an improvement to real property, * * * shall be brought against any person performing or furnishing the design, planning, supervision, materials, or observation of construction or construction of the improvement to real property or against the owner of the real property more than two years after discovery of the injury.

Minn.Stat. § 541.051, subd. 1(a). The court of appeals, in an unpublished split decision, affirmed the district court's grant of summary judgment. *Lietz*, 2005 WL 44905, at *4.

Jaenty argues that the lower courts' determination that section 541.051 barred its action is erroneous in two respects: (1) the anchor was not an "improvement to real property" because it was not completely installed at the time of the accident, and (2) Jaenty's damages arose out of negligent construction activities, not the defective and unsafe condition of an improvement to real property. We address each of these arguments in turn.

## I.

■■■■ On appeal from summary judgment, this court determines "whether there are any genuine issues of material fact, and whether the lower court erred in its application of the law." *Olmanson v.*

LeSueur County, 693 N.W.2d 876, 879 (Minn.2005). Evidence is viewed in a light most favorable to the nonmoving party. *Ruud v. Great Plains Supply, Inc.*, 526 N.W.2d 369, 371 (Minn.1995). The construction of a statute is reviewed de novo. *Olmanson*, 693 N.W.2d at 879.

■■■■ When defining an "improvement to real property" for the purposes of section 541.051, this court has said that a "common-sense interpretation" should be used. *Pac. Indem. Co. v. Thompson–Yaeger, Inc.*, 260 N.W.2d 548, 554 (Minn.1977). This court has defined such an improvement as

"[A] permanent addition to or betterment of real property that enhances its capital value and that involves the expenditure of labor or money and is designed to make the property more useful or valuable as distinguished from ordinary repairs."

*Sartori v. Harnischfeger Corp.*, 432 N.W.2d 448, 451 (Minn.1988) (quoting *Pac. Indem. Co.*, 260 N.W.2d at 554). Jaenty claims that the anchor does not meet this definition in one respect, namely, the anchor was not a *permanent* addition to the real property at the time of the explosion because the explosion occurred *during the installation* of the anchor.[1]

---

1. In their joint brief, Sirti, Seren and CCI claim that, before the district court, Jaenty failed to argue that the anchor was not an improvement to real property based on the lack of complete installation. Because of this failure, Sirti, Seren and CCI argue that this court should not consider this issue on appeal. In general, an issue will not be considered on appeal if it was not first raised below. *Putz v. Putz*, 645 N.W.2d 343, 350 (Minn. 2002). In its response memorandum to the district court concerning respondents' motion for summary judgment, Jaenty stated that " '[t]he ordinary insertion of an anchor' is not an improvement to real property." Jaenty's

memorandum did not specifically ground this argument on the anchor's lack of "permanence," but in reaching its decision, the district court found that the installation of the fiber-optic cable—and specifically the installation of the anchor—was an improvement to real property. In making this finding the district court used the definition of improvement to real property found in *Pacific Indemnity Co.*, which includes the requirement that the alleged improvement be a "permanent addition to or betterment of real property." We conclude that Jaenty has sufficiently preserved this issue for appeal.

██ Whether the installation of an object (that otherwise meets the definition of an "improvement to real property") must be complete at the time the injury occurs for the object to be an "improvement to real property" for purposes of section 541.051 is a question that has not been previously decided by this court. While, under *Pacific Indemnity Co.*, an improvement to real property must be a "permanent addition to or betterment of real property," this court has never interpreted "permanence" to require complete installation. When interpreting the meaning of a statute, this court's primary goal is to "interpret and construct laws so as to ascertain and effectuate the intention of the legislature." *Olmanson*, 693 N.W.2d at 879; *see* Minn.Stat. § 645.16 (2004). This court will not look beyond the plain language of the statute if the words of the statute are "clear and free from all ambiguity." *Olmanson*, 693 N.W.2d at 879; *see* Minn.Stat. § 645.16. A statute is considered ambiguous "if it is reasonably susceptible to more than one interpretation." *Current Tech. Concepts, Inc. v. Irie Enters., Inc.*, 530 N.W.2d 539, 543 (Minn. 1995). Having examined the statute at issue, we conclude that the plain language of section 541.051 can reasonably be read either to apply to or not to apply to damages caused by an object (otherwise meeting the definition of an improvement) during its installation.

If a statute is ambiguous, this court may look to other factors, such as the occasion and necessity for the law, to determine legislative intent. Minn.Stat. § 645.16. In a decision interpreting a prior version of section 541.051, this court presumed, based on the timing of the enactment of section 541.051 and similar statutes enacted in other states, that section 541.051 was enacted because of the recent erosion of the privity of contract doctrine and the "resulting exposure of architects and builders to potential liability of indefinite duration from third-party tort claims." *Kittson County v. Wells, Denbrook & Assocs., Inc.*, 308 Minn. 237, 241–42, 241 N.W.2d 799, 802 (1976). Before the erosion of this doctrine, the general rule was that building and construction contractors ceased to be liable to third parties when the contractors' work was completed and accepted by the owner. *See Pac. Indem. Co.*, 260 N.W.2d at 554.[2] If limiting the liability exposure which resulted from the erosion of the privity of contract doctrine is the purpose of section 541.051, damages caused *before* the work was completed and accepted by the owner—damages during the installation process—appear to be outside the scope of the statute.

██ The legislature has already indicated, however, that section 541.051 is intended to bar a broader range of claims than those prohibited before the erosion of the privity of contract doctrine. The original version of section 541.051 did not specify the types of actions barred. *See* Minn. Stat. § 541.051, subd. 1 (1965) ("[N]o action to recover damages for any injury to property * * * arising out of the defective and unsafe condition of an improvement to real property * * * shall be brought * * * more than two years after discovery thereof * * *."). This court limited the statute's coverage to tort actions in which the defendant asserting section 541.051 as a defense was not in privity with the plaintiff. *Kittson County*, 308 Minn. at 242, 241 N.W.2d at 802. The legislature specifical-

---

**2.** As noted in *Pacific Indemnity Co.*, 260 N.W.2d at 554, prior to the enactment of section 541.051, this court had adopted a rule of liability to third parties on the part of building contractors after the work had been completed and accepted by the owner. *See Murphy v. Barlow Realty Co.*, 206 Minn. 527, 531–36, 289 N.W. 563, 565–67 (1939).

ly broadened the statute's scope in 1980 by amending it to state that it covered "action[s] by any person in contract, tort, or otherwise to recover damages." Act of April 7, 1980, ch. 518, § 2, 1980 Minn. Laws 595, 596 (codified as amended at Minn.Stat. § 541.051, subd. 1 (2004)).[3] This amendment indicates that the legislature had a broader purpose for section 541.051 than simply limiting the liability exposure which occurred after the erosion of the privity of contract doctrine.[4]

 When the plain language of a statute is ambiguous, another factor considered in the search for legislative intent is the consequence of a particular interpretation. Minn.Stat. § 645.16(6). If this court adopts Jaenty's argument that installation must be "complete" for something to qualify as an "improvement to real property," difficult distinctions will need to be drawn between "partially-installed" items that are *not* covered by section 541.051 and "completely-installed" improvements that are covered by section 541.051. Based on the legislature's decision to broaden the scope of section 541.051 and based on the negative consequences of Jaenty's proposed in-

terpretation, we hold that an object need not be completely installed in order to qualify as an "improvement to real property" within the meaning of Minn.Stat. § 541.051.[5]

## II.

 Having concluded that the anchor qualifies as an improvement to real property, the next issue before the court is whether Jaenty's damages "arose out of the defective and unsafe condition" of the anchor. If the damages "arose out of the defective and unsafe condition" of the anchor, Jaenty's claims are barred by the two-year statute of limitations. Jaenty argues that its injuries arose out of "negligent construction activities" rather than the defective and unsafe condition of the anchor and thus Jaenty's claims should not be subject to the two-year statute of limitations. We address this issue in two ways: (1) whether the condition of the anchor was "defective and unsafe," and (2) whether Jaenty's alleged injuries "arose out of the condition" of the anchor.

 We have previously said that whether an injury arises out of a defective

---

**3.** In *Kittson County*, this court interpreted section 541.051 using a rule of strict construction. 308 Minn. at 240–41, 241 N.W.2d at 801. The court justified this rule of construction based on the uncertain scope of the statute, the harsh result of the statute, and potential constitutional issues raised by the absolute nature of the statute of repose in section 541.051. *Id.* at 240–41, 241 N.W.2d at 801. In light of the legislature's decision to broaden and clarify the scope of section 541.051 and because this court has subsequently held the statute of repose constitutional, *see Sartori,* 432 N.W.2d at 452–54, we overrule *Kittson County* to the extent that it requires a rule of strict construction to be used when interpreting section 541.051.

**4.** We recognize that in *Sartori* this court stated that section 541.051 was designed to "eliminate suits against architects, designers

and contractors who have completed the work, turned the improvement to real property over to the owners, and no longer have any interest or control in it." *Sartori,* 432 N.W.2d at 454. *Sartori,* however, dealt with the application of the *statute of repose* found in section 541.051—not the statute of limitations. *See* 432 N.W.2d at 451. Under section 541.051, the statute of repose does not begin to run until "after substantial completion of the construction." Minn.Stat. § 541.051, subd. 1(a). For this reason, while *Sartori* may give guidance on the purpose of the statute of repose in section 541.051, it does not provide guidance on the issue facing this court.

**5.** We note that the Minnesota Court of Appeals has come to the same conclusion when interpreting section 541.051. *See O'Connor v. M.A. Mortenson Co.,* 424 N.W.2d 92, 94 (Minn.App.1988).

and unsafe condition "turns on the individual facts alleged in the complaint." *Griebel v. Andersen Corp.,* 489 N.W.2d 521, 523 (Minn.1992) (holding that to be "defective and unsafe" an improvement need not be a risk to human health). Here, the complaint alleged that the anchor was drilled in a negligent manner, that respondents' negligence after the gas line strike prevented those in danger from being warned, and that respondents' negligence prevented the gas from being turned off in time to avert an explosion. At the time of the explosion, the anchor was bent out of alignment and had pierced a gas line. Jaenty appears to argue that this condition of the anchor does not qualify as a "defective and unsafe condition" because any damage to the anchor or caused by the anchor occurred because of errors during the installation process.

This court has already held that negligence during the installation process can lead to a "defective and unsafe condition of an improvement to real property." *See Pac. Indem. Co.,* 260 N.W.2d at 552–55 (holding that a previous version of section 541.051 applied to damages resulting, in part, from installing a furnace too close to a nearby wall).[6] Because the anchor was not installed correctly and presented a safety hazard at the time of Jaenty's alleged injuries, and because this court has previously held that errors during installation can create a "defective and unsafe condition of an improvement to real property," we conclude that the anchor was in a defective and unsafe condition at the time the alleged injury occurred.

▮▮▮ Having determined that the anchor was in a "defective and unsafe con-

dition" at the time of Jaenty's alleged injuries, the remaining inquiry is whether Jaenty's claimed injuries "arose out of" this condition. Jaenty argues that "there is no causal connection between the injuries sustained by Jaenty and the condition of the anchor" and that the accident was caused by respondents' negligence. Because we reaffirm that negligence during installation can create a "defective and unsafe condition of an improvement to real property," this claim is without merit. This court has not yet been required to define the exact parameters of the definition of "arising out of" in section 541.051; this case does not require us to do so. The anchor was in a defective and unsafe condition because during installation it was bent out of alignment and punctured a gas line. There is proximate cause between a negligent act and an injury when the act is " 'one which the party ought, in the exercise of ordinary care, to have anticipated was likely to result in injury to others.' " *Canada v. McCarthy,* 567 N.W.2d 496, 506 (Minn.1997) (quoting *Lubbers v. Anderson,* 539 N.W.2d 398, 402 (Minn.1995)). A plaintiff must also show that the negligent conduct was a substantial factor in bringing about the injury. Id. While the existence of proximate cause is usually a question of fact for the jury, "when reasonable minds could reach only one conclusion," it is a question of law. Id. Viewing the evidence in a light most favorable to Jaenty, the installation of the anchor in a manner which severed a gas line was an act that a person exercising reasonable care would anticipate was likely to result in injury to others, and the puncture of the gas line was a substantial factor in bringing about the resulting explosion and Jaen-

6. The only support Jaenty cites for its argument is *Wiita v. Potlatch Corp.,* 492 N.W.2d 270 (Minn.App.1992). In *Wiita,* the court of appeals held that the cement blocks which fell from a crane onto the plaintiff did not consti-

tute an improvement to real property. *Wiita,* 492 N.W.2d at 272. *Wiita* is of little help here as the court of appeals did not address the question of whether the blocks were in a "defective and unsafe condition."

ty's alleged injuries. Given this causal connection, we hold that Jaenty's alleged injuries arose out of the defective and unsafe condition of the anchor.[7]

Affirmed.

HANSON, J., took no part in the consideration or decision of this case.

GILDEA, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

PAGE, Justice (dissenting).

I respectfully dissent. While the court correctly points out that we are to use a "common-sense interpretation" when defining what constitutes an improvement to real property, the court fails to apply any common sense in defining the anchor here, which was in the process of being put in place when it struck the gas pipeline, to be an improvement to real property. As a result, Jaenty's negligence claims based on respondents' act of drilling the anchor into the gas pipeline causing its rupture are defeated by the statute of limitations. This result is one that the statute does not contemplate.

Minnesota Statutes § 541.051, subd. 1(a) (2004), in relevant part provides:

Except where fraud is involved, no action by any person in contract, tort, or otherwise to recover damages for any injury to property, real or personal, or for bodily injury or wrongful death, arising out of the defective and unsafe condition of an improvement to real property * * * shall be brought * * * more than two years after discovery of the injury * * *.

The phrase "improvement to real property" as used in the statute and as interpreted in our case law means " 'a permanent addition to or betterment of real property that enhances its capital value and that involves the expenditure of labor or money and is designed to make the property more useful or valuable as distinguished from ordinary repairs.' " *Pac. Indem. Co. v. Thompson–Yaeger, Inc.,* 260 N.W.2d 548, 554 (Minn.1977) (quoting *Kloster–Madsen, Inc. v. Tafi's, Inc.,* 303 Minn. 59, 63, 226 N.W.2d 603, 607 (1975)). In construing section 541.051, we are to give "effect to the plain meaning of the words of the statute without resort to technical legal constructions of its terms." *Pac. Indem.,* 260 N.W.2d at 554.

The anchor at issue in this case, at the time it was drilled into the gas pipeline, was not a "permanent addition to or betterment of real property." Webster's Third New International Dictionary, Unabridged, defines "permanent" as "continuing or enduring (as in the same state, status, place) without fundamental or marked change: not subject to fluctuation or alteration: fixed or intended to be fixed: lasting, stable." Webster's Third New International Dictionary 1683 (1993); *see also* Merriam–Webster's Collegiate Dictionary 863 (10th ed.2001) (defining "permanent" as "continuing or enduring without fundamental or marked change: Stable"). The word "addition" is defined as "a part added to or joined with a building." Webster's Third New International Dictionary 24; *see also* Merriam–Webster's Collegiate Dictionary 13 (defining "addition" as "a part added (as to a building or residential section)"). The word "betterment" is defined as "a making or becoming better: * * * an improvement of an estate (as by

---

**7.** Because we conclude that all of Jaenty's claims against respondents arose out of the defective and unsafe condition of the anchor, we need not reach NSP's claim that Jaenty's claims against NSP are barred on the separate basis that *the gas line* struck by the anchor qualifies as an improvement to real property under section 541.051.

the addition of new buildings) that makes it better and more valuable than mere repairing would do." Webster's Third New International Dictionary 209; *see also* Merriam–Webster's Collegiate Dictionary 109 (defining "betterment" as "an improvement that adds to the value of a property or facility"). Giving the words in the phrase "permanent addition or betterment of real property" their common and approved usage and applying their plain meaning, it is clear that the phrase contemplates a completed addition or betterment. Indeed, if "permanent" does not mean completed, it is unclear to me what "permanent" is intended to mean.

Common sense dictates that an anchor that is drilled into a gas pipeline while in the process of being installed cannot constitute a permanent improvement to real property for purposes of section 541.051, subdivision 1(a). Because the anchor here was still in the process of being installed and was not yet "stable," that is, not continuing or enduring without fundamental or marked change and not fixed or intended to be fixed at the time, it was not, in fact could not have been, a permanent addition or betterment of real property at the time the pipeline was ruptured. Although the anchor might at some point have become a permanent addition to real property, at the time it was being drilled into the pipeline causing the rupture, it was not. Therefore, the anchor does not qualify as an improvement to real property.

This is not to say that negligence during installation will always preclude an object from being treated as an improvement to real property. For instance, in *Pacific Indemnity*, the negligent installation of a furnace led to a fire that occurred 20 years later and destroyed portions of a strip mall. *Pac. Indem.*, 260 N.W.2d at 551–52. In that case, we held that the negligent installation of the furnace led to a harm that arose out of an improvement to real property. Id. at 554. The difference between the furnace in *Pacific Indemnity* and the anchor in the instant case is that the installation of the furnace in *Pacific Indemnity* was complete and the resulting harm arose from the manner in which the furnace had been installed and not, as here, the act of installation itself. Like *Pacific Indemnity*, all of the other cases in which we have addressed whether there was an improvement to real property for purposes of Minn.Stat. § 541.051, subd. 1(a), have involved improvements that were completed long before the injury arose. *See, e.g., Sartori v. Harnischfeger Corp.*, 432 N.W.2d 448, 452 (Minn.1988) (crane considered permanent improvement because it was in place for nearly 20 years); *Frederickson v. Alton M. Johnson Co.*, 402 N.W.2d 794, 795–96 (Minn.1987) (electrical switchboard, which had been previously installed in a shopping mall, considered improvement to real property); *Bulau v. Hector Plumbing & Heating Co.*, 402 N.W.2d 528, 529–30 (Minn.1987) (fireplace installed at least one year before injury was improvement to real property). My research has turned up no cases in which we have held that there was an improvement to real property when it was the act of installing rather than the manner of installing the improvement that resulted in the harm.

In order for the limitations provisions of section 541.051, subdivision 1(a), to apply, the injury at issue must also arise out of a defective and unsafe condition. That did not happen here. As the opinion correctly points out, whether an injury arises out of a defective and unsafe condition "turns on the individual facts alleged in the complaint." *See Griebel v. Andersen Corp.*, 489 N.W.2d 521, 523 (Minn.1992). The complaint in the underlying action alleges that the injury arose because the anchor

was drilled in a negligent manner, respondents failed to warn those in danger, and respondents' negligence prevented the gas from being turned off in time to avert an explosion. As such, the complaint contained no fact that would indicate that the gas explosion arose out of the anchor's defective and unsafe condition. The record as developed bears this out. In fact, the National Transportation Safety Board cited the lack of procedures to prevent damage to nearby utilities when the anchor crew encountered unusual conditions as the "probable cause of this accident."

Further, because of the legislature's use of the conjunctive "and" in the phrase "defective and unsafe condition," the anchor must have been both defective and unsafe for the limitations period in section 541.051, subdivision 1(a), to apply. While it can be argued that, as a result of being bent as it was being installed, the anchor was in a defective condition when it struck the pipeline, it cannot be seriously argued that the anchor was in an unsafe condition. What made the anchor unsafe was not its condition but the act of drilling it into the gas pipeline. Had the anchor not been drilled into the pipeline, the harm inflicted here would not have occurred no matter what the condition of the anchor. Therefore, the injury did not arise out of a defective and unsafe condition. Because the damage Jaenty sustained did not arise out of a defective and unsafe condition of an improvement to real property, the statute of limitations found in section 541.051, subdivision 1(a), does not bar Jaenty's claims.

That Minn.Stat. § 541.051, subd. 1(a), does not act to bar Jaenty's claims is supported by our statement in *Sartori* that "[t]he statutory limitation period [found in section 541.051, subdivision 1] is designed to eliminate suits against architects, designers and contractors who have *completed the work, turned the improvement to real property over to the owners, and no longer have any interest or control in it.*" 432 N.W.2d at 454 (emphasis added). Obviously, at the time the anchor was drilled into the pipeline the work had not been completed, the anchor had not been turned over to its owners, and respondents continued to have an interest in and control of the anchor. Equally obvious is the fact that the purpose of the limitations period cannot be met by applying section 541.051, subdivision 1(a), in this case.

Finally, I note that the statute of limitations found in section 541.051, subdivision 1(a), is short—two years as opposed to the six-year limitations period applicable to ordinary negligence actions. Minn.Stat. § 541.05, subd. 1 (2004). This shortened limitations period can, as in this case, work a harsh result. Yet the court broadens the application of the statute based in part on "the legislature's decision to broaden and clarify the scope of section 541.051." The court's broadening of the application of section 541.051 is, at best, misguided. In clarifying and broadening the scope of the statute, the legislature did nothing more than make clear that the statute covers more types of actions than simply tort actions. The legislature did nothing to change, modify, broaden, or clarify the statute's "arising out of the defective and unsafe condition of an improvement to real property" language. Moreover, the legislature's changes did nothing to address the concerns raised by this court in *Kittson County v. Wells, Denbrook & Associates, Inc.*, that "the statute has the potential of working a harsh result * * * because of the shortness of the 2–year" statute of limitations. 308 Minn. 237, 240, 241 N.W.2d 799, 801 (1976). Thus, the legislative amendments provide no basis for overruling *Kittson County*.