# STATE OF MINNESOTA
# IN COURT OF APPEALS
# A14-0490

Michael Yaggie, Russell Henderson, Brent Torkelson, Robert Maack, Vernon Simmer,
Robert Westfall, Shannon Maack, Jesse Stuehrenberg, David Emery, Mark Blaufuss,
James Blaufuss and Gerald Nordick,
Relators,

vs.

Superintendent Warren Schmidt and the Rothsay School Board Members (ISD 850),
Respondents.

**Filed November 10, 2014**
**Affirmed**
**Klaphake, Judge**[*]

Office of Administrative Hearings
File No. OAH 68-0325-31293

Stephen M. Harris, Neil M Meyer, James M. Njus, Meyer & Njus, P.A., Minneapolis,
Minnesota (for relators)

Stephen M. Knutson, Michelle D. Kenney, Knutson, Flynn & Deans, P.A., Mendota
Heights, Minnesota (for respondents)

Lori Swanson, Attorney General, St. Paul, Minnesota (for respondent Office of
Administrative Hearings)

Considered and decided by Hooten, Presiding Judge; Johnson, Judge; and

Klaphake, Judge.

## S Y L L A B U S

Minn. Stat. § 211B.13 (2012) (defining as a felony a person's promise of anything

of value to induce a voter to vote in a particular way) does not prohibit a school board

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to
Minn. Const. art. VI, § 10.

from informing property owners of the effect of a referendum on their property taxes as required by Minn. Stat. § 123B.71 (2012) (directing school boards to provide information on the effect of a bond issue on local property taxes to the commissioner of education (the commissioner), and to publish a summary of the commissioner's response prior to the referendum).

**O P I N I O N**

**KLAPHAKE**, Judge

Relators, owners of agricultural property in a school district, challenge in a certiorari appeal the administrative law judge's dismissal of their complaint against respondents, the school district's board and superintendent, in which relators alleged that respondents violated Minn. Stat. § 211B.13 by inducing them to vote in favor of a bond referendum by promising not to impose an excess levy if the referendum passed.

**FACTS**

In April 2013, four months after the failure of a bond referendum to finance a new K-12 school building, respondent Board of Independent School District (ISD) 850 (Board) sent a letter to all voting households in the district concerning a new referendum. The letter said in relevant part:

> As you view the enclosed proposed tax impact studies one can visualize that without the [previously approved] $1,500 excess levy, which the Board has promised not to use if [this] referendum is successful, all residential homestead dwellings under $200,000 will experience a **net decrease** in taxes. As most of the property in our district is ag[ricultural] land[,] ag[ricultural] land would carry the largest burden in this proposal, just as it did [in] the previous proposal. We as

2

> a school district have no control [of] this fact as the tax impact is calculated by state statute.
>
> Also enclosed in this information you shall find the Review and Comment from the Commissioner of Education.

The referendum passed.

Relators, both resident and non-resident owners of agricultural property in ISD 850, filed a complaint alleging that the Board had violated Minn. Stat. § 211B.13 (2012) by promising not to use the excess levy if the referendum was successful, thus inducing voters to vote for the referendum. The complaint said in relevant part:

> [Respondents] were well aware that the owners of much of the "ag. land" [in ISD 850] did not live within the school [district's] voting boundaries and were helpless to oppose the referendum. The promise not to use the [Board's] authority to levy the $1500 excess referendum was a promise to pay in order to induce the residents to vote in support of the referendum.

The complaint was dismissed on the ground that it did not present a prima facie violation of Minn. Stat. § 211B.13, and relators' request for reconsideration was denied.

## ISSUE

Did respondents' letter violate Minn. Stat. § 211B.13?

## ANALYSIS

This court reviews de novo an agency decision that "is based upon the meaning of words in a statute." *In re Denial of Eller Media Co.'s Application for Outdoor Adver. Device Permits,* 664 N.W.2d 1, 7 (Minn. 2003).

Minn. Stat. § 211B.13, subd. 1, provides in relevant part: "[a] person who willfully, directly or indirectly, . . . promises . . . any money . . . or other thing of

3

monetary value . . . in order to induce a voter to refrain from voting, or to vote in a particular way, at an election, is guilty of a felony." Relators argue that, because Minn. Stat. § 211B.13 includes the word "promises" and respondents' letter referred to "the $1,500 excess levy, which [respondents have] promised not to use if the referendum is successful," respondents' letter violated the statute. But respondents could equally well have said, "the $1,500 excess levy, which respondents will not use if the referendum is successful" or "the $1,500 excess levy, which respondents will not need to use if the referendum is successful"; the fact that respondents happened to use the word "promise" in their letter did not make the letter a violation of Minn. Stat. § 211B.13.

Campaign promises are a feature of most elections, and any candidate who promises to lower taxes, reduce government expenses, or improve government services is promising voters something "of monetary value" possibly, if not probably, "to induce [them] . . . to vote in a particular way." Minn. Stat. § 211B.13, subd. 1. A literal interpretation of the statute leads to the unreasonable and absurd conclusion that any candidate who makes such a promise should be prosecuted for a felony. This interpretation must be rejected, because a court presumes that "the legislature does not intend a result that is absurd, impossible of execution, or unreasonable." Minn. Stat. § 645.17 (1) (2012). When a statute is susceptible of more than one interpretation, it is ambiguous, and a court considers other factors to ascertain the legislature's intent. *Lietz v. N. States Power Co.*, 718 N.W.2d 865, 870 (Minn. 2006).

Here, the language of the statute in its entirety indicates the legislature's intent.

> A person who willfully, directly or indirectly, advances, pays, gives, promises, or lends any money, food, liquor, clothing, entertainment, or other thing of monetary value, or who offers, promises, or endeavors to obtain any money, position, appointment, employment, or other valuable consideration, to or for a person, in order to induce a voter to refrain from voting, or to vote in a particular way, at an election, is guilty of a felony.

Minn. Stat. § 211B.13, subd. 1. The legislature clearly intended to prohibit the buying of votes, with cash or with anything else, in accord with the state's "legitimate interest in upholding the integrity of the electoral process itself." *Brown v. Hartlage*, 456 U.S. 45, 52, 102 S. Ct. 1523, 1528 (1982) (construing a similar Kentucky statute in the context of a candidate's promise to serve for less than the legally mandated salary). Respondents were not buying or attempting to buy votes for the referendum when they informed voters of the tax consequences of passing the referendum. Moreover, respondents had both a First-Amendment right and a statutory obligation to inform voters of these consequences. *See* U.S. Const. amend I, Minn. Stat. § 123B.71, subd. 12 (2012).

Respondents' letter was protected by the First Amendment. Like the candidate in *Brown* who informed voters that he would serve at a reduced salary, respondents sent their letter

> [to] assist the voters in predicting the effect of their vote. The fact that some voters may find their self-interest reflected in [an electoral issue] does not place that [issue] beyond the reach of the First Amendment. We have never insisted that the franchise be exercised without taint of individual benefit; indeed, our tradition of political pluralism is partly predicated on the expectation that voters will pursue their individual good through the political process, and that the summation of

5

these individual pursuits will further the collective welfare. So long as the hoped-for personal benefit is to be achieved through the normal processes of government, and not through some private arrangement, it has always been, and remains, a reputable basis upon which to cast one's ballot.

*Id.* at 55-56, 102 S. Ct. at 1530. "[The promised] benefit was to extend beyond those voters who cast their ballots for Brown, to all taxpayers and citizens. . . . [I]t was conditioned not on any particular vote or votes, but entirely on the *majority's* vote." *Id.* at 58, 102 S. Ct. at 1531.

Here, as in *Brown,* the promise not to use the excess levy if the referendum passed would benefit those who voted against the referendum as well as those who voted for it: the decrease in property taxes would occur for all owners of homes valued at less than $200,000, regardless of how they had voted. "[A] promise to confer some ultimate benefit on the voter, qua taxpayer, citizen, or member of the general public, does not lie beyond the pale of First Amendment protection." *Id.* at 58-59, 102 S. Ct. at 1531-32. Respondents had a right under the First Amendment to inform voters of the tax consequences of the referendum.

Respondents also had a statutory obligation to inform voters of those consequences; with their letter, they met "the obligation of a school district to educate voters on the purposes and effects of a district-proposed ballot question." *Abrahamson v. St. Louis Cnty. Sch. Dist.*, 819 N.W.2d 129, 140 (Minn. 2012) (Paul Anderson, J., concurring).[1]  Before deciding to hold the referendum, respondents had to inform the

---

[1] Relators rely on *Abrahamson*, but that case is not on point. It concluded that: (1) a school district is a corporation within the meaning of Minn. Stat. ch. 211A and therefore

6

commissioner of "at least . . . the effect of a bond issue on local property taxes by the property class and valuation." Minn. Stat. § 123B.71, subd. 9(8) (2012). The commissioner was then required to submit a review and comment "about the educational and economic advisability of the project." Minn. Stat. § 123B.71, subd. 11 (2012). Finally, respondents had to publish "[a]t least 20 days but not more than 60 days before [the] referendum . . . a summary of the commissioner's review and comment of that project in the legal newspaper of the district." Minn. Stat. § 123B.71, subd. 12 (2012). Respondents' letter enclosed the commissioner's review and comment and summarized its results, also fulfilling the mandate of Minn. Stat. § 123B.71, subd. 12, that "[s]upplementary information shall be available to the public."

Assuming arguendo that respondents' obligation under Minn. Stat. § 123B.71, subd. 12, did conflict with the prohibition of Minn. Stat. § 211B.13, the obligation would prevail. When a specific statutory provision appears to contradict a general provision, the specific provision controls within its scope of application. Minn. Stat. § 645.19 (2012). Respondents had a very specific statutory "obligation . . . to educate voters on the purposes and effects of a district-proposed ballot question." *Abrahamson,* 819 N.W.2d at 140. The statutory limitation on influencing voters imposed on "[a] person" by Minn. Stat. § 211B.13 is far more general.

---

subject to its campaign-finance-reporting requirements, and (2) the inclusion of a "worst case assumption" of a prospective deficit was not a prima facie violation of Minn. 211B.06 (prohibiting the dissemination of false information to promote or defeat a ballot question). *Abrahamson,* 819 N.W.2d at 130. Relators have not said or implied that any of the information in respondents' letter was false, and respondents' corporate status was not at issue.

# DECISION

Respondents' letter informing voters of a tax advantage consequent upon the passing of a referendum was mandated by Minn. Stat. § 123B.71, subd. 12; was protected by the First Amendment; and did not violate Minn. Stat. § 211B.13.

**Affirmed.**