# STATE OF MINNESOTA
# IN COURT OF APPEALS
# A14-1601

Minnesota Voters Alliance, et al., complainants,
Relators,

vs.

Anoka-Hennepin School District,
Respondent,

Minnesota Office of Administrative Hearings,
Respondent.

**Filed July 27, 2015**
**Affirmed**
**Bjorkman, Judge**


Office of Administrative Hearings
File No. 48-0325-30140

Erick G. Kaardal, Mohrman, Kaardal & Erickson, P.A., Minneapolis, Minnesota (for relators)

Jeanette M. Bazis, Katherine M. Swenson, Greene Espel PLLP, Minneapolis, Minnesota; and

Paul Cady, Anoka-Hennepin School District, Anoka, Minnesota (for respondent Anoka-Hennepin School District)

Lori Swanson, Attorney General, St. Paul, Minnesota (for respondent Minnesota Office of Administrative Hearings)

        Considered and decided by Bjorkman, Presiding Judge; Schellhas, Judge; and

Stauber, Judge.

A school district's act of placing a levy question on the ballot is not an act to "promote" the levy question within the meaning of Minn. Stat. § 211A.01, subd. 4 (2014). A school district acts to "promote" a levy ballot question within the meaning of Minn. Stat. § 211A.01, subd. 4, only when it urges the adoption of the levy ballot question by express advocacy or by statements that, viewed as a whole, are the functional equivalent of express advocacy.

## OPINION

**BJORKMAN**, Judge

Relators challenge the decision of a panel of administrative-law judges dismissing their complaint against respondent school district for allegedly violating campaign-finance-reporting requirements in connection with three levy ballot questions. Relators argue that the panel erred by determining that respondent did not "promote" the levy ballot questions within the meaning of Minn. Stat. § 211A.01, subd. 4, and therefore was not subject to reporting requirements. We affirm.

### FACTS

Respondent Anoka-Hennepin School District (the school district) is funded in part by levies approved by voters in the district. In August 2011, the school board passed a resolution to present three levy-funding questions to voters in a special election on November 8, 2011. The ballot questions asked voters whether to: (1) renew an existing levy providing $1,044 per student per year for the next ten years; (2) approve a levy of $3 million each year for ten years for technology; and (3) approve a levy of $12 million

2

per year for ten years as a stop-gap measure if the legislature fails to approve inflationary funding.

In the months before the election, the school district informed voters about the levy questions in multiple ways. The school district conducted two public meetings in September, provided an online property-tax calculator for voters to gauge the effect of each proposed levy, and mailed a one-page notice of special election and a one-page sample ballot to all 81,235 addresses in the district. And it created and disseminated the five-page brochure at issue in this appeal.

The outside of the brochure highlights the principal purpose and the anticipated tax impact of each proposed levy, noting that the school district prepared and paid for the brochure and that the brochure "is not circulated on behalf of any candidate or ballot question." Inside, the brochure explains the effects of approving or rejecting each levy request. The school district posted an electronic version of the brochure on its website on October 27, and mailed brochures to all 81,235 addresses in the district on October 31. The school district spent more than $15,000 on printing and distributing the brochure; it did not file a campaign-finance report regarding the expenditures.

Nearly one year after the special election, relators Minnesota Voters Alliance and Donald Huizenga filed a complaint with respondent Minnesota Office of Administrative Hearings, alleging that the school district violated campaign-finance-reporting requirements under Minn. Stat. § 211A.02 (2014) and engaged in unfair campaign practices under Minn. Stat. § 211B.06 (2014) in connection with the brochure. An administrative-law judge (ALJ) granted the school district summary disposition

3

dismissing both claims as untimely. We affirmed the dismissal of the unfair-campaign-practices claim but reversed the dismissal of the campaign-finance-reporting claim and remanded for further proceedings. *Minn. Voters All. v. Anoka Hennepin Sch. Dist.*, No. A13-0769 (Minn. App. Dec. 23, 2013).

On remand, a panel of three ALJs granted the school district summary disposition, concluding that the school district did not promote the levy ballot questions and therefore was not required to report the funds it expended on preparing and distributing the brochure. Relators bring this certiorari appeal.

## ISSUES

I.    Did the school district promote the levy ballot questions within the meaning of Minn. Stat. § 211A.01, subd. 4, by placing the levy questions on the ballot?

II.   Did the school district promote the levy ballot questions within the meaning of Minn. Stat. § 211A.01, subd. 4, by its statements in the brochure?

## ANALYSIS

We may affirm or remand an administrative decision or may reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the determination violates the constitution, exceeds the agency's statutory authority or jurisdiction, is affected by legal error, is not supported by substantial evidence, or is arbitrary or capricious. Minn. Stat. § 14.69 (2014); *Abrahamson v. St. Louis Cnty. Sch. Dist.*, 819 N.W.2d 129, 133 (Minn. 2012). "Summary disposition is the administrative equivalent of summary judgment." *Pietsch v. Minn. Bd. of Chiropractic Exam'rs*, 683

4

N.W.2d 303, 306 (Minn. 2004). We review de novo the application of law to undisputed facts. *Id.*

This case requires us to consider a school district's conduct in the context of a levy election. Our analysis is therefore informed not only by the Minnesota election laws, Minn. Stat. §§ 200.01-211C.09 (2014), but also by numerous provisions of the education code, Minn. Stat. §§ 120A.01-129C.30 (2014). *See* Minn. Stat. § 205A.02 ("Except as provided by law, the Minnesota Election Law applies to school district elections."). We look first to the education code.

A school district is required to "furnish school facilities to every child of school age residing in any part of the district." Minn. Stat. § 123B.02, subd. 2. It has broad express and implied authority to fulfill this duty, including the obligation and authority to "provide by levy of tax necessary funds for the conduct of schools."[1] Minn. Stat. § 123B.02, subds. 1, 8. Often, as here, a school district must first obtain voter approval in a levy election. *See* Minn. Stat. §§ 123B.63, subd. 3, 126C.17, subd. 9. But in seeking that approval, the school district also has the obligation and the discretionary authority to explain to voters the purposes and anticipated impact of the proposed levy. *See* Minn. Stat. §§ 123B.63, subd. 3, 126C.17, subd. 9; *Yaggie v. Schmidt*, 855 N.W.2d 769, 772-73 (Minn. App. 2014) (citing *Abrahamson*, 819 N.W.2d at 140 (Paul Anderson, J., concurring)); *accord Citizens to Protect Pub. Funds v. Bd. of Educ.*, 98 A.2d 673, 676 (N.J. 1953) (stating that power to give voters "relevant facts to aid them in reaching an

---

[1] Because the school board has "the general charge of the business of the [school] district," Minn. Stat. § 123B.02, subd. 1, we do not distinguish between the district and the board in our analysis.

informed judgment when voting upon the [levy] proposal" is implicit in school district's power to finance schools and seek voter approval for such financing); Op. Atty. Gen. 159a-3 (May 24, 1966) (opining, based in part on *Citizens to Protect Pub. Funds*, that a school district may "impartially place pertinent facts before voters").[2]

If a school district's public statements about a levy election cross the line from explanation to promotion,[3] the election law may impose additional requirements. Any "committee" that "makes disbursements of more than $750 in a calendar year" must report such disbursements. Minn. Stat. § 211A.02, subd. 1. A "committee" is "a corporation or association or persons acting together . . . to promote or defeat a ballot question." Minn. Stat. § 211A.01, subd. 4. Because a school district is a public corporation, it is subject to campaign-finance-reporting requirements if it acts to promote or defeat a ballot question. *Abrahamson*, 819 N.W.2d at 130, 135-36.

Relators argue that the school district promoted the 2011 levy ballot questions by (1) placing the questions on the ballot and (2) urging the adoption of the questions in the brochure. Whether the school district acted to "promote" the levy ballot questions within the meaning of Minn. Stat. § 211A.01, subd. 4, is a question of statutory interpretation,

---

[2] "[O]pinions of the attorney general are entitled to careful consideration by appellate courts, particularly when they are of long standing." *Billigmeier v. Cnty. of Hennepin*, 428 N.W.2d 79, 82 (Minn. 1988); *see also* Minn. Stat. § 8.07 (2014) (providing that written opinion of the attorney general is "decisive" on "all school matters . . . until the question involved shall be decided otherwise by a court of competent jurisdiction").

[3] Whether a school district may advocate for only one side of a ballot question and whether it may expend public funds to do so are separate questions that we need not decide. *See Abrahamson*, 819 N.W.2d at 135.

6

which we review de novo. *Id.* at 133. Our primary objective in interpreting a statute is "to ascertain and effectuate the intention of the legislature." Minn. Stat. § 645.16 (2014). To do so, we first determine whether the statutory language is clear. *Hans Hagen Homes, Inc. v. City of Minnetrista*, 728 N.W.2d 536, 539 (Minn. 2007). "If a statute, construed according to ordinary rules of grammar, is unambiguous, this court engages in no further statutory construction and applies its plain meaning." *In re D.W.*, 766 N.W.2d 365, 367 (Minn. App. 2009) (quotation omitted), *review denied* (Minn. Aug. 26, 2009). We consider a statute as a whole, and in context, to determine its plain meaning. *In re Admin. Order Issued to Wright Cnty.*, 784 N.W.2d 398, 403 (Minn. App. 2010). We presume that the legislature intends the entire statute to be effective, with no word or phrase superfluous, and does not intend an unreasonable or unjust result. Minn. Stat. § 645.17 (2014); *Am. Family Ins. Grp. v. Schroedl*, 616 N.W.2d 273, 277-78 (Minn. 2000).

**I.     The school district did not promote the levy ballot questions by placing the questions on the ballot.**

Under the election law, promoting a ballot question "includes efforts to qualify . . . a proposition . . . for placement on the ballot." *See* Minn. Stat. § 211A.01, subd. 4. The statute does not define the term "qualify," but it generally means to "make competent or eligible for an office, position, or task." *The American Heritage Dictionary* 1439 (5th ed. 2011). To "qualify" a proposition for placement on the ballot thus encompasses undertaking a step or process necessary to make a proposition eligible for placement on the ballot.

Relators argue that the school district promoted the levy questions because it placed them on the ballot. We are not persuaded. Section 211A.01, subdivision 4, does not refer to *placing* a proposition on the ballot; it refers to *qualifying* a proposition for placement on the ballot. The distinction is more than semantic. Both the election law and education-code provisions recognize that there are two ways for a levy proposition, or any other "matter requiring approval of the voters of a [school] district," to get placed on a ballot—the school district can independently place the proposition on the ballot, or voters can submit a petition that qualifies the proposition for placement on the ballot. Minn. Stat. § 205A.05, subd. 1(a); *see also* Minn. Stat. § 126C.17, subd. 9(a) (acknowledging both possibilities). By conflating these two alternatives, relators render part of the statute superfluous, contrary to principles of statutory interpretation. *See Schroedl*, 616 N.W.2d at 277. And we are not convinced that a school district's undisputedly mandatory act of presenting the levy questions to voters, in and of itself, implicates election-law requirements, particularly when its "required or authorized" election-related expenditures are, by definition, not subject to the campaign-finance reporting requirements. *See* Minn. Stat. § 211A.01, subd. 6. Accordingly, we conclude that the school district's placement of the levy questions on the ballot was not an act of promotion within the meaning of Minn. Stat. § 211A.01, subd. 4.

## II. The school district did not promote the levy ballot questions in the brochure.

Promoting a ballot question also includes any efforts that "'urge the adoption of' or 'advocate'" for the ballot question. *See Abrahamson*, 819 N.W.2d at 136 (quoting *The American Heritage Dictionary* 1410 (5th ed. 2011)). Express advocacy, such as an

admonition to "Vote yes," clearly falls within this definition. But there is no evidence or allegation that the school district engaged in express advocacy. We therefore must consider whether statements that do not expressly advocate for a ballot question can constitute promotion within the meaning of Minn. Stat. § 211A.01, subd. 4, and if so, how to evaluate such statements.

While these are questions of first impression, we do not start with a blank slate. In *Abrahamson*, our supreme court implicitly rejected an express-advocacy requirement by permitting a campaign-finance-reporting claim to go forward against a school district without any allegation or evidence of express advocacy.[4] *Abrahamson*, 819 N.W.2d at 135-36. The school district nonetheless urges us to adopt express advocacy as the standard, arguing that it is clear and consistent with the penal nature of Minn. Stat. § 211A.02. We are not persuaded. A definition of promotion limited to express advocacy is unnaturally cramped and unrealistic, given the subtle, malleable, and context-dependent nature of language. *See State v. Scacchetti*, 711 N.W.2d 508, 513-15 (Minn. 2006) (discussing numerous factors bearing on the "purpose" of a statement); *Hunter v. Hartman*, 545 N.W.2d 699, 706-07 (Minn. App. 1996) (discussing nuances of language in defamation doctrines of hyperbole, opinion, and substantial truth), *review denied* (Minn. June 19, 1996). And an express-advocacy standard is inconsistent with the broader statutory framework, which recognizes the implicitly promotional nature of

---

[4] Abrahamson argued that a school district promoted a building-bond ballot question by publishing materials "conveying exaggerated statements regarding the [school district's] financial condition and false statements suggesting that defeat of the resolution would cause taxes to increase." *Abrahamson*, 819 N.W.2d at 136.

qualifying a proposition for placement on the ballot. We therefore conclude that promoting a ballot question under Minn. Stat. § 211A.01, subd. 4, encompasses both express and implicit advocacy.

We next consider the appropriate framework for determining whether statements are implicitly promotional. The parties do not dispute, and we agree, that alleged implicitly promotional statements must be judged as a whole, according to an objective reasonable-voter standard.[5] *See Schmitt v. McLaughlin*, 275 N.W.2d 587, 591 (Minn. 1979) (looking to "average voter" in evaluating election publication). But this objective standard could be applied in two ways. Either statements are implicitly promotional when a reasonable person *could* interpret them as advocacy—the standard relators endorse—or statements are implicitly promotional when a reasonable person *could not* interpret them as anything other than advocacy—the "functional equivalent of express advocacy" standard that the ALJ panel applied. *See Fed. Election Comm'n v. Wisconsin Right To Life, Inc.*, 551 U.S. 449, 469-70, 127 S. Ct. 2652, 2667 (2007) (stating, in the context of a First Amendment challenge to advertising restrictions, that speech is "the functional equivalent of express advocacy only if [it] is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific [proposition]").

---

[5] Despite endorsing an objective standard, relators argue that that the ALJ panel erred by not requiring or considering "reasonable voter" affidavits. We disagree. Promotion, under an objective standard, does not depend on the view of any particular voter but on the nature of the statements in question. *See Abrahamson*, 819 N.W.2d at 136; *Barry v. St. Anthony-New Brighton Indep. Sch. Dist. 282*, 781 N.W.2d 898, 903 (Minn. App. 2010). The ALJ panel did not err in concluding that the school district's failure to submit affidavits as to voters' views of statements in the brochure is not fatal to its defense.

In considering these two options, we are mindful of the unique position a school district is in when it places a levy question on the ballot. As we noted above, a school district is not only required to place certain issues before the electorate but also has the obligation and the discretionary authority to educate voters about those issues. *Yaggie*, 855 N.W.2d at 772-73; *Citizens to Protect Pub. Funds*, 98 A.2d at 677. And, as a practical matter, a school district that proposes a levy is not neutral. It is asking voters to decide an issue that directly affects the district's ability to fulfill its statutory duties. To educate voters about the levy issue is, at least in part, to explain the rationale for the request. Such explanatory statements may seem promotional because they reflect the reality that the school district favors the proposed levy. But they are part and parcel of placing the levy question on the ballot and are no more inherently promotional than that initial act. Adopting relators' restrictive approach to implicit promotion would severely hamper school districts in educating voters about levy issues. We are not convinced that the election law requires that result.

At the same time, a school district's efforts to inform voters are not unbounded. A district's acts may implicate the election law when it misrepresents the financial situation, exaggerates the impact of a "no" vote, or otherwise presents inaccurate information. In those circumstances, a reasonable voter could only view the statements as promotional. In short, there is space between the education code and the election law for a school district to propose and explain a levy without necessarily crossing over the promotional line. We conclude that the functional-equivalent-of-express-advocacy standard best reflects this space. Accordingly, we hold that a school district's statements about a levy

11

ballot question implicitly promote the question within the meaning of Minn. Stat. § 211A.01, subd. 4, only when, viewed as a whole, they are the functional equivalent of express advocacy. In other words, the statements are promotional only when a reasonable person could not interpret them as anything other than advocacy.

With this standard in mind, we turn to relators' specific allegations. Relators identify several statements in the school district's brochure that they contend cross the line from informational to promotional. We consider each in turn and in light of the brochure as a whole.

First, relators contend that the brochure is promotional because it misrepresents state-funding averages in stating the background for Question 3 (funding stop-gap). Relators focus on the following statement: "The district's costs of providing educational programs and services increase roughly 2.5% to 3% per year but state funding increases have averaged only 1 percent per year over the past 10 years." Relators contend that the 1% figure is false and misleading because the average state funding for the school district is, according to relators' calculations, closer to 3.2%. We disagree. The school district obtained the information from data published by the Minnesota Department of Education and the Minnesota House of Representatives Research Department. Relators do not dispute that the 1% figure is consistent with published financial information the school district considered in deciding to place Question 3 on the ballot, or that it accurately represents the trajectory of state funding generally. Similarly, relators do not dispute that the brochure accurately states that "the state is unlikely to provide an inflationary increase in 2013," and the levy would provide $260 per student per year to compensate,

which the school district would not levy if the state provided inflationary funding. Overall, the reference to 1% state funding increases does not mislead voters regarding state funding but forms part of an accurate description of the financial landscape the school district faced.

Second, relators point to the checked box and words "Vote November 8" on the front cover of the brochure as promotional.[6] We are not persuaded. The statement urges people to vote; it does not urge them to vote in any particular way. In this respect, it is indistinguishable from the unchallenged portions of the brochure explaining how to register, find a polling place, and vote by absentee ballot. And the checked box is merely a visual depiction of the act of voting. The November 2011 ballot required voters to indicate their vote on the levy questions by filling in a "yes" circle or a "no" circle. A checked box does not suggest one vote any more than the other.

Third, relators note the school district's use of bold-type font to highlight certain facts or phrases, many of which concern the arguably positive effects of the levy questions passing: "**reasonable class size," "specialist teachers**," "**equitable student access to computers**," "**audio and video infrastructure**," and "**wireless internet**." Relators do not contend that any of the bolded terms are inaccurate or misleading. Nor do they identify any authority for the proposition that making certain information more eye-catching constitutes advocacy.

---

[6]

Fourth, relators assert that the brochure urges adoption of the ballot questions because it "threaten[ed]" particular negative conduct if each levy question failed, particularly noting the statement that the school district "will cut $48 million from the budget" if Question 1 (the existing $48 million levy) does not pass. Relators contend that these statements painted a "dire picture" in an effort to garner support for the levy ballot questions. We disagree. It is undisputed that the consequences described for each potential levy failure accurately track the information that the school district's chief financial officer presented to the school board in August 2011, and which informed the school district's decision to place the levy questions on the ballot. Accurate statements informing voters about the negative consequences that will result if a levy is not passed or renewed are not threats or unfair characterizations amounting to advocacy. *See Citizens to Protect Pub. Funds*, 98 A.2d at 677 (contrasting "disclosure of all relevant facts" with statements that exhorted and "over-dramatized" consequences of levy failure).

Fifth, relators argue that the brochure is "one-sided" because it does not contain any "opposition statements." Relators identify no authority for the proposition that the school district must present "opposition statements" to avoid crossing the line between informing and promoting. Rather, a school district fairly informs voters about a levy question when it addresses the positive and negative consequences of the levy, "not only the anticipated improvement in educational opportunities, but also the increased tax rate and such other less desirable consequences as may be foreseen." *See id.* It is undisputed that the brochure accurately recites the average tax impact of each proposed levy and directs voters to a website where they could obtain a more specific estimate of their tax

14

consequences.  The lack of "opposition statements" does not render the brochure promotional.

Finally, relators point to several subjective statements in the brochure, such as the prediction that students would feel "frustrated with unreliable and inefficient computers" if the technology levy fails, and the quotation from a citizen-staff funding-review team[7] that "large-scale cuts" would require "sacrificing or at least compromising cherished and long time assumptions about what are necessary components of a good education."  We agree with the ALJ panel that these statements, "if viewed in isolation, may come close to crossing over the line into promotion."  But we do not consider them in isolation.  The statements appear in the context of a brochure that accurately recites the tax consequences to voters of each levy passing and the anticipated impact on schools of each levy passing or failing.  The brochure repeatedly acknowledges that the decision is up to the voters.  And the brochure expressly disclaims any intent to favor a particular ballot question.

Overall, the school district's brochure presented accurate factual information to explain why it placed the levy questions before the voters.  The brochure left little doubt that the school district favored the levies, but more than that is required to cross the line between informing and promoting.  Because the brochure as a whole does not mislead,

---

[7] The brochure states that the citizen-staff Future Focus Team "urged the board to renew the [existing] levy."  In a footnote, the brochure explains: "Future Focus Team included 25% staff and 75% community members representing parents, city and county government, business, engineering, legal, and higher education.  It met January through June 2011 to [make] recommendations on ways to cut costs yet still provide educational programs our communities want."

overly dramatize the financial situation, or exaggerate the consequences of passage or defeat of the levy questions, we conclude that a reasonable person could interpret it as informational. Accordingly, we hold that the school district's brochure did not "promote" the levy questions within the meaning of Minn. Stat. § 211A.01, subd. 4.[8]

## DECISION

The school district did not promote the levy ballot questions within the meaning of Minn. Stat. § 211A.01, subd. 4, by placing the questions on the ballot or by implicitly urging their adoption in the brochure. It therefore was not subject to campaign-finance-reporting requirements and is entitled to summary dismissal of relators' claim.

**Affirmed.**

---

[8] Because we conclude that the school district did not promote the levy ballot questions, we decline to separately address its alternative argument that the funds it expended to create, print, and disseminate the brochure were not "disbursements" within the meaning of Minn. Stat. § 211A.01, subd. 6 (2014).

16