**SCHOOL PUPILS: EXCLUSION: FEES:** Minnesota law prohibits schools or districts participating in the federal school lunch program from providing an alternate meal not on the scheduled menu to students with unpaid meal debt.

169i
(cr.ref. 169x)



November 17, 2022

Heather Mueller, Ed. D.
Commissioner
Minnesota Department of Education
400 NE Stinson Boulevard
Minneapolis, MN 55412

**Re:    Opinion Request – Alternate Lunches for Student Meal Debt**

Dear Commissioner:

Thank you for your correspondence requesting an opinion from this Office pursuant to Minnesota Statutes §§ 8.07 and 120A.10. You request an interpretation of Minnesota law related to school menus. Specifically, you ask whether a policy of providing a meal that differs from the scheduled menu to students with unpaid meal balances violates Minnesota laws that prohibit differential treatment, lunch shaming or otherwise ostracizing the student for unpaid meal balances.

In my opinion, providing an alternate meal based on meal debt violates Minnesota law.

### BACKGROUND

You indicate that a number of public schools or districts across the state have adopted policies whereby students with unpaid meal balances are denied lunch items from the scheduled menu for the day. Students with unpaid meal balances are provided instead with what schools and districts refer to as an "alternate meal," a "minimum meal," or a "courtesy meal."

For example, one district's policy states that students with an overdrawn account will be offered an "alternate meal consisting of a cheese sandwich, piece of fruit and milk." Another district policy states that "until the negative balance is paid" students will receive a "minimum meal" consisting of "a peanut butter or jelly sandwich and milk." Some school policies simply indicate the alternate meal will meet federal and state requirements.

A review of school menus posted on the internet indicates that many, though not all, schools and districts provide a variety of daily meal options each day.

## QUESTION

Is providing alternate meals to students with unpaid meal debt permissible under Minnesota Statutes, sections 124D.111 and 123B.34-123B.39?

## ANSWER AND LEGAL ANALYSIS

No. Minnesota law prohibits schools or districts participating in the federal school lunch program from providing an alternate meal, i.e. one that is not on the scheduled menu, to students with unpaid meal debt. I first evaluate whether a policy of providing an alternate meal not on the scheduled menu violates a Minnesota law (Minn. Stat. § 124D.111) that requires respectful treatment of students regarding school lunch debt and prohibits limiting access to many aspects of school life based on meal debt. I then evaluate whether alternate meal policies violate the Minnesota Public School Fee law (Minn. Stat. §§ 123B.34-.39), which prohibits differential treatment of students based on nonpayment of school fees or charges.

**A. Respectful Treatment Regarding Meal Debt**. The first law your letter references is Minn. Stat. § 124D.111. Prior to changes to the law made in 2021, this statute provided simply that schools and districts that participate in the school meals program must "ensure that any reminders for payment of outstanding student meal balances do not demean or stigmatize any child participating in the school lunch program." Minn. Stat. § 124D.111, subd. 4 (2020). In 2019, I concluded that denying a student the opportunity to participate in graduation ceremonies due to meal debt would demean or stigmatize the student in violation of this provision. Op. Atty. Gen. 169j (May 14, 2019) (attached).

Subsequent to that Opinion, the Legislature strengthened section 124D.111 by adding subdivision 5(a), which requires:

Respectful treatment. (a) The participant [school or district] must also provide meals to students in a respectful manner according to the policy adopted under subdivision 1. The participant must ensure that any reminders for payment of outstanding student meal balances do not demean or stigmatize any child participating in the school lunch program, including but not limited to dumping meals, withdrawing a meal that has been served, announcing or listing students' names publicly, or affixing stickers, stamps, or pins. The participant must not impose any other restriction prohibited under section 123B.37 due to unpaid student meal balances. The participant must not limit a student's participation in any school activities, graduation ceremonies, field trips, athletics, activity clubs, or other extracurricular activities or access to materials, technology, or other items provided to students due to an unpaid student meal balance.

Minn. Stat. § 124D.111, subd. 5(a).

**Demeaning or Stigmatizing**. Whether an alternate meal demeans or stigmatizes students with meal debt is a somewhat fact-based determination that this Office generally declines to make. *See* Op. Atty. Gen. 629-a (May 9, 1975). However, the examples of demeaning and stigmatizing conduct provided in the statute (which are not an exclusive list) shed light on whether an alternative meal is of the same character. Withdrawing or dumping a meal, publication of names of students, "stickers, stamps, or pins" as enumerated in the statute constitute practices that bring negative attention to a student based on meal debt.

An alternate or minimum meal could also bring negative attention, especially if alternate or minimum meals are provided for no reason other than meal debt. If identifiable alternate meals are provided only or primarily to students with outstanding meal debt, these students are clearly identified among their peers as owing meal debt. As such, the practice would stigmatize a student. Even if many other students are opting for an alternate meal, the student who has no choice in the matter may, depending on the circumstances of how the meal is presented, feel demeaned or stigmatized. For example, if some students ask for a peanut butter sandwich but students with meal debt are simply given a peanut butter sandwich without the student expressing a choice, those circumstances can be demeaning and stigmatizing for the student with meal debt.

Ultimately the determination of whether an alternate meal policy stigmatizes or demeans a student is a factual determination, and the statute places you as Commissioner in the role of determining whether a participant has violated subdivision 5(a). Minn. Stat. § 124D.111, subd. 5(b). I believe the appropriate inquiry regarding stigma is to determine whether the circumstances under which alternate or minimum meals are provided brings negative attention to the student, such as when only or primarily students with outstanding meal debt receive identifiable alternate meals, or when it is apparent that students with meal debt have no choice in meal selection.

**Prohibition on Access Limitations**. Section 124D.111, subd. 5(a) also prohibits limiting a student's access to "any school activities, graduation ceremonies, field trips, athletics, activity clubs, or other extracurricular activities or access to materials, technology, or other items provided to students" due to meal debt. By providing an alternate or minimum meal, the school or district denies access to the scheduled meal of the day based on meal debt. The list of school experiences to which access may not be limited in the statute does not expressly include the scheduled menu. However, "other items provided to students" is a catch-all category that could include the scheduled menu.

Whether "other items provided to students" includes the scheduled menu requires statutory interpretation. The first step in this endeavor is to determine if the phrase is unambiguous and can be given its plain meaning, or is ambiguous, requiring statutory construction. *State v. Vasko*, 889 N.W.2d 551, 556 (Minn. 2017). Because "other items provided to students" is susceptible to more than one reasonable interpretation, it is ambiguous.

Once ambiguity is determined, we turn to principles of statutory construction. *Id.* The purpose of engaging in any statutory construction is to effectuate the intent of the Legislature. Minn. Stat. § 645.16. The phrase must be given a meaning that is contextually appropriate. *State v. Friese*, 959 N.W.2d 205, 211 (Minn. 2021). More specifically, the "word association" canon of statutory construction provides that the meaning of doubtful words in a legislative act are determined with reference to their connection to associated words and phrases. *Id.* at 213 (citing *State v. Seuss*, 52 N.W.2d 409, 415 (Minn. 1952)). Words grouped in a list should be given related meanings. *Friese*, 959 N.W.2d at 213.

In Minn. Stat. § 124D.111, subd. 5(a), "other items provided to students" directly follows the words "materials" and "technology," which suggests the phrase might be limited to curriculum-related "other items" and not the scheduled menu. But the phrase is also associated – in the very same sentence – with "any school activities, graduation ceremonies, field trips, athletics, activity clubs, or other extracurricular activities." Minn. Stat. § 124D.111, subd. 5(a). Because extracurricular activities are included in the list of aspects of the educational experience that cannot be limited based on school debt, the word association canon of construction requires that we not interpret "other items provided to students" to include only curriculum-related items.

Another canon of construction is the presumption that the Legislature does not intend a result that is absurd or unreasonable. Minn. Stat. § 645.17(1). It is hard to fathom that the Legislature would prohibit limiting access to "athletics, activity clubs or other extracurricular activities," which are wholly unrelated to meal debt but allow schools to deny access to the everyday public activity of receiving the service associated with the debt – a scheduled school lunch. Denying access to the daily scheduled meal is arguably more likely to stigmatize a student with meal debt than denying access to an optional extracurricular activity unrelated to the debt. Given the clear intent of the Legislature to avoid stigma, and the expansive list of school experiences to which access cannot be denied based on meal debt, I must conclude that the Legislature intended to include the scheduled lunch for the day within the category of "other items provided to students," and to prohibit alternate lunch based on school debt.

Therefore, even if there is no actual stigma associated with an alternate meal, the broad prohibition against limiting access to a wide variety of school activities includes access to the scheduled menu as an "other item[] provided to students." The practice of providing an alternate meal based on meal debt, which denies access to the scheduled menu, thus violates Minnesota law.

**B. Minnesota Public School Fee Law**. The second law your letter references is the Minnesota Public School Fee Law, Minn. Stat. §§ 123B.34-.39, which prohibits differential treatment of students based on nonpayment of school fees or charges.

This law establishes the general policy that, "Any practice leading to . . . discriminatory action based upon nonpayment of fees denies pupils their right to equal protection and entitled privileges." Minn. Stat. § 123B.35. In addition to this policy statement, the law contains a specific prohibition: "No pupil's rights or privileges, including the receipt of grades or diplomas may be denied or abridged for nonpayment of fees." Minn. Stat. § 123B.37, subd. 2.

Application of this specific prohibition to the alternate meal policy, which denies access to the scheduled menu, requires a determination of whether access to the scheduled menu constitutes a "right or privilege." Federal regulations require schools participating in the national school lunch program to offer "nutritious, well-balanced and age-appropriate meals to all the children they serve." 7 C.F.R. § 210.10 (a)(1). These regulations require participating schools to follow a menu planning approach and produce enough food "to offer each child the quantities specified in the meal pattern." *Id*. at § 210.10(a)(1)(i). The pattern requirements include a designated quantity of a variety of foods each week. *Id.* at § 210.10(c).

Although your letter stipulates that the alternate meals meet federal nutrition requirements, providing an alternate or minimum meal day after day until the debt is paid appears to me contrary to the required variety reflected in the federal regulations. These menus are carefully designed to meet federal nutrition requirements for a balanced diet, and I question the practice of providing the same spartan meal every day as long as the debt is unpaid. However, a conclusive determination whether access to the varied scheduled menu constitutes a right or privilege under the Public School Fee law is unnecessary here in light of the conclusion above that an alternate meal policy based on meal debt violates Minn. Stat. § 124D.111, subd. 5(a).

As Commissioner, you play a critical role in implementing the statutory requirement for respectful treatment regarding meal debt, and I hope this analysis is helpful to you. Thank you for the inquiry and concern for all students in Minnesota's public schools.

Sincerely,

KEITH ELLISON
Attorney General

Encl:   Op. Atty. Gen. 629a (May 9, 1975)
        Op. Atty. Gen. 169j (May 14, 2019)

|#5343230-v3

## Opinions of the Attorney General

### Hon. WARREN SPANNAUS

**ATTORNEY GENERAL: OPINIONS OF:** Proper subjects for opinions of Attorney General discussed.

Thomas M. Sweeney, Esq.                    May 9, 1975
Blaine City Attorney                            629-a
2200 American National Bank Building       (Cr. Ref. 13)
St. Paul, Minnesota 55101

In your letter to Attorney General Warren Spannaus, you state substantially the following

#### FACTS

At the general election in November 1974 a proposal to amend the city charter of Blaine was submitted to the city's voters and was approved. The amendment provides for the division of the city into three election districts and for the election of two council members from each district. It also provides that the population of each district shall not be more than 5 percent over or under the average population per district, which is calculated by dividing the total city population by three. The amendment also states that if there is a population difference from district to district of more than 5 percent of the average population, the charter commission must submit a redistricting proposal to the city council.

The Blaine Charter Commission in its preparation and drafting of this amendment intended that the difference in population between election districts would not be more than 5 percent over or under the average population for a district. Therefore, the maximum allowable difference in population between election districts could be as great as 10 percent of the average population.

You then ask substantially the following

#### QUESTION

Does the Blaine City Charter, as amended, permit a maximum population difference between election districts of 10 percent of the average population per district?

#### OPINION

The answer to this question depends entirely upon a construction of the Blaine City Charter. No question is presented concerning the authority to adopt this provision or involving the application or interpretation of state statutory provisions. Moreover, it does not appear that the provision is commonly found in municipal charters so as to be of significance to home rule charter cities generally. See Minn. Stat. § 8.07 (1974), providing for the issuance of opinions on questions of "public importance."*

---

\* Minn. Stat. § 8.07 (1974) lists those officials to whom opinions may be issued. That section provides as follows:

The attorney general on application shall give his opinion, in writing, to county, city, town attorneys, or the attorneys for the board of a school district or unorganized territory on questions of public importance; and on application of the commissioner of education he shall give his opinion, in writing, upon any question arising under the laws relating to public schools. On all school matters such opinion shall be decisive until the question involved be decided otherwise by a court of competent jurisdiction.

See also Minn. Stat. §§ 8.05 (regarding opinions to the leg-

IN THIS ISSUE

| Subject | Op. No. | Dated |
|---|---|---|
| ATTORNEY GENERAL: Opinions Of. | 629-a | 5/9/75 |
| COUNTY: Pollution Control: Solid Waste. | 125a-68 | 5/21/75 |

In construing a charter provision, the rules of statutory construction are generally applicable. See 2 McQuillin, Municipal Corporations § 9.22 (3rd ed. 1966). The declared object of statutory construction is to ascertain and effectuate the intention of the legislature. Minn. Stat. § 645.16 (1974). When the words of a statute are not explicit, the legislature's intent may be ascertained by considering, among other things, the occasion and necessity for the law, the circumstances under which it was enacted, the mischief to be remedied, and the object to be attained. Id.

Thus, an interpretation of a charter provision such as that referred to in the facts would require an examination of a number of factors, many of which are of a peculiarly local nature. Local officials rather than state officials are thus in the most advantageous position to recognize and evaluate the factors which have to be considered in construing such a provision. For these reasons, the city attorney is the appropriate official to analyze questions of the type presented and provide his or her opinion to the municipal council or other municipal agency. The same is true with respect to questions concerning the meaning of other local legal provisions such as ordinances and resolutions. Similar considerations dictate that provisions of federal law generally be construed by the appropriate federal authority.

For purposes of summarizing the rules discussed in this and prior opinions, we note that rulings of the Attorney General do not ordinarily undertake to:

(1) Determine the constitutionality of state statutes since this office may deem it appropriate to intervene and defend challenges to the constitutionality of statutes. See Minn. Stat. § 555.11 (1974); Minn. R. Civ. App. P. 144; Minn. Dist Ct. (Civ.) R 24.04; Op. Atty. Gen. 733G, July 23, 1945.

(2) Make factual determinations since this office is not equipped to investigate and evaluate questions of fact. See, e.g., Ops. Atty. Gen. 63a-11, May 10, 1955 and 121a-6, April 12, 1948.

(3) Interpret the meaning of terms in contracts and other agreements since the terms are generally adopted for the purpose of preserving the intent of the parties and construing their meaning often involves factual determinations as to such intent. See. Op. Atty. Gen. 629-a, July 25, 1973.

(4) Decide questions which are likely to arise in litigation which is underway or is imminent, since our opinions are advisory and we must defer to the judiciary in

---

islature and legislative committees and commissions and to state officials and agencies) and 270.09 (regarding opinions to the Commissioner of Revenue).

**MINNESOTA LEGAL REGISTER**

Published monthly and containing all Opinions
of the Minnesota Attorney General

**Published by The Progress-Register**

200 Upper Midwest Bldg., Minneapolis, Mn. 55401
Sold only in combination with The Progress-
Register (weekly) at $15.00 per year in Min-
nesota. Out-of-state $16.00 per year. Payable
in advance. Binder and index service included.

Second-class postage paid at Minneapolis, Mn.

such cases. See Ops. Atty. Gen. 519M, Oct. 18, 1956, and 196n, March 30, 1951.

(5) Decide hypothetical or moot questions. See Op. Atty. Gen. 519M, May 8, 1951.

(6) Make a general review of a local ordinance, regulation, resolution or contract to determine the validity thereof or to ascertain possible legal problems, since the task of making such a review is, of course, the responsibility of local officials. See Op. Atty. Gen. 477b-14, Oct. 9, 1973.

(7) Construe provisions of federal law. See textual discussion **supra.**

(8) Construe the meaning of terms in city charters and local ordinances and resolutions. See textual discussion **supra.**

We trust that the foregoing general statement on the nature of opinions will prove to be informative and of guidance to those requesting opinions.

WARREN SPANNAUS, Attorney General
Thomas G. Mattson, Assist. Atty. Gen.

**SCHOOL PUPILS: GRADUATION: FEES:** Public schools are prohibited from denying students – who are eligible to receive their diploma – the opportunity to participate in graduation ceremonies due to unpaid meal debts.

169j
(cr.ref. 169x)

# STATE OF MINNESOTA

### OFFICE OF THE ATTORNEY GENERAL

**KEITH ELLISON**
ATTORNEY GENERAL

102 STATE CAPITOL
ST. PAUL, MN 55155-1609
TELEPHONE: (651) 296-6197

May 14, 2019

Mary Cathryn Ricker
Commissioner
Minnesota Department of Education
1500 Highway 36 West
Roseville MN 55113

Dear Commissioner Ricker:

Thank you for asking the Attorney General's Office to provide a written opinion on whether denying a student's opportunity to participate in graduation ceremonies or activities because of an unpaid meal debt violates state law. Pursuant to Minn. Stat. § 8.07 (2018), here is our response.

### FACTS

You indicated that you have recently become aware that several Minnesota school districts have policies that restrict a student's ability to participate in graduation ceremonies or activities when the student has an unpaid school meal debt owing to the school.

### QUESTION

You have asked whether the practice of restricting a student from participating in graduation ceremonies or activities because the student has an outstanding school meal debt violates Minnesota statutes.

### LEGAL ANALYSIS

In my opinion, public schools[1] are prohibited under Minnesota statutes from denying students the opportunity to participate in graduation ceremonies due to unpaid meal charges. I base this opinion on both the Minnesota Public School Fee Law, Minn. Stat. §§ 123B.34-39, (the "Law") and the Lunch Aid Law, Minn. Stat. § 124D.111, subd. 4.

---

[1] "Public schools" refer to Minnesota public elementary and secondary schools; school districts; and charter schools that are all subject to the Public School Fee Law.

**Minnesota Public School Fee Law:**

"It is the policy of the state of Minnesota that public school education shall be free." Minn. Stat. § 123B.35. The Minnesota Public School Fee Law explicitly provides:

> No pupil's rights or privileges, including the receipt of grades or diplomas may be denied or abridged for nonpayment of fees...

Minn. Stat. § 123B.37, subd. 2. The Law further provides:

> Any practice leading to suspension, coercion, *exclusion*, withholding of grades or diplomas, or *discriminatory action based upon nonpayment of fees* denies pupils their right to equal protection and entitled privileges.

Minn. Stat. § 123B.35 (emphasis added). As discussed in more detail below, (1) a charge for a school-provided meal qualifies as a "fee" under the Law, and (2) the opportunity to participate in graduation ceremonies is covered by this Law, and is a privilege that cannot be denied because of outstanding meal balances.

First, a charge for a meal by a public school is a "fee" subject to the Public School Fee Law. Minn. Stat. § 123B.36, subd. 1(b) lists "authorized fees" that a public school may require payment, and subdivision 1(b)(6) authorizes: "fees specifically permitted by any other statute." Both federal (*see* 42 U.S.C. § 1760(p)(2) – "each school food authority shall establish a price for paid lunches" served to students who are not certified to receive free or reduced price meals) and state (Minn. Stat. § 124D.111, subd. 4 – entitled "No fee" and restricts reminders for payment of meals) statutes authorize participating schools to charge a fee for meals for qualified students. In addition, subdivision 1(b)(5) in the list of authorized fees includes: "items of personal use or products that a student has an option to purchase…", which can include a meal (a product) that the student has option to purchase.

Second, the Law applies to students' participation in graduation ceremonies. While section 123B.37, subd 2 cited above expressly cites "grades or diplomas," its use of the introductory term "including" means the statutory prohibition is not limited to those examples. *See Fed. Land Bank of St. Paul v. Bismarck Lumber Co.,* 314 U.S. 95, 100 (1941) (stating that "the term 'including' is not one of all-embracing definition, but connotes simply an illustrative application of the general principle"); *LaMont v. Indep. Sch. Dist. No. 728,* 814 N.W.2d 14, 19 (Minn. 2012) ("The word 'includes' is not exhaustive or exclusive").

In general, many courts across the country have held that participation in a graduation ceremony does not constitute a constitutional property right in the same way as the right to

receive a diploma or degree when one has met all academic requirements.[2] Participation in graduation ceremonies is more likely a privilege,[3] akin to participation in extracurricular athletic activities.[4] *See Olson v. Robbinsdale Area Schools,* No. Civ. 04–2707, 2004 WL 1212081 *4 (D. Minn. 2004) ("Participating in a high school graduation ceremony with one's own peers is, almost by definition, an unrepeatable event" and upholding a hearing officer's conclusion that participation in the graduation ceremony with peers is an "important educational benefit."). Accordingly, I conclude that participation in a graduation ceremony constitutes a benefit or privilege, for which public schools cannot deny or abridge for nonpayment of fees under section 123B.37, subd. 2.

Graduation ceremonies are significant events and a memorable way to celebrate the important achievement of graduation with families, fellow students, and teachers. Participation in graduation ceremonies is a privilege, and therefore, a public school cannot exclude a student from participating in the school activity based upon nonpayment of fees. Minn. Stat. § 123B.37, subd. 2. Moreover, this practice leading to exclusion or discriminatory action based upon nonpayment of fees denies students their right to equal protection and entitled privileges as provided by Minn. Stat. § 123B.35.

**Lunch Aid Law:**

In addition to the Public School Fee Law, public schools participating in the School Lunch Program under current Minnesota law are expressly prohibited from demeaning or stigmatizing students for outstanding student meal balances:

> The [school] must also ensure that any reminders for payment of outstanding student meal balances do not demean or stigmatize any child participating in the school lunch program.

Minn. Stat. § 124D.111, subd. 4. Denying students the opportunity to participate in their school graduation due to nonpayment of meals is a reminder or message to others that would demean or stigmatize students. That is prohibited under Section 124D.111, subd. 4.

---

[2] *See Nieshe v. Concrete Sch. Dist,* 129 Wash. App. 632, 645, 127 P.3d 713, 720, (2005); *See also, Williams v. Austin Indep. Sch. Dist.,* 796 F.Supp. 251, 255 (W.D.Tex 1992).

[3] "Privilege" is defined as "a right or immunity granted as a peculiar benefit, advantage or favor." *Merriam–Webster's Collegiate Dictionary* 936 (9th ed. 1983). Participation in a graduation ceremony due to successful completion of required coursework, examinations and all academic requirements is a benefit.

[4] *See Brown v. Wells,* 288 Minn. 468, 181 N.W.2d 708 (1970) (membership in interscholastic sports teams is a privilege).

In sum, schools retain the right to pursue legal collection action for unpaid fees. But public schools are prohibited from denying students – who are eligible to receive their diploma – the opportunity to participate in graduation ceremonies due to unpaid meal debts, under the Public School Fee and State School Lunch Aid Laws.

## CONCLUSION

I understand that there is pending legislation to strengthen the enforcement, reporting and policies regarding school meals and lunch aid. I support that legislation. In the meantime, because we are in the midst of high school graduation season, I am issuing this Written Opinion that is binding on school officers unless overruled by a court.[5]

Let me know if you have further concerns. Thank you for your concern for all students in Minnesota's public schools.

Sincerely,

KEITH ELLISON
Attorney General

|#4488342-v1

---

[5] *See,* Minn. Stat. § 120A.10; *Minnesota Voters Alliance v. Anoka-Hennepin Sch. Dist.,* 868 N.W.2d 703, 707, n.2, (Minn. Ct. App. 2015) (written opinion of the attorney general is "decisive" on all school matters until decided otherwise by courts.) *See also, Eelkema v. Bd. of Educ. of City of Duluth,* 215 Minn. 590, 593, 11 N.W.2d 76, 78, (Minn. 1943) (attorney general "opinion, though not binding on the courts, was, by statute law, binding upon school officers until overruled by the courts.")